987 So.2d 669 (2007)
Joseph Javaun WOODS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D06-4274.
District Court of Appeal of Florida, Second District.
September 7, 2007.
James Marion Moorman, Public Defender, and Timothy J. Ferreri, Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and William I. Munsey, Jr., Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Judge.
Joseph Javaun Woods appeals an order that the trial court apparently intended to *670 serve as a judgment and sentence for direct criminal contempt. We reverse the order for three reasons. First, the order is not a sufficient judgment with a recital of facts. Second, the trial court failed to provide Mr. Woods the right to appointed counsel before conducting a cursory hearing and sentencing Mr. Woods to 179 days in jail. Finally, the trial court did not prove that Mr. Woods' utterance of the single word "shit" in apparent frustration while he was leaving a closed-circuit courtroom facility inside the county jail was an act that constituted direct criminal contempt. On remand, assuming that a videotape of this event still exists and that the delays caused by the trial court's numerous errors have not unduly prejudiced Mr. Woods' ability to answer to these charges, the trial court may reconsider the charge of direct criminal contempt after appointing counsel to represent Mr. Woods. It may only adjudicate Mr. Woods guilty of this offense, however, if it can establish beyond a reasonable doubt that Mr. Woods' conduct fell within the narrow range of conduct constituting direct criminal contempt.

I. THE PROCEEDINGS IN THE TRIAL COURT
In June 2005, Mr. Woods was arrested for possession of marijuana, a misdemeanor, and for the possession of marijuana with intent to sell, a felony. He was declared indigent and received appointed counsel. In January 2006, Mr. Woods entered into a negotiated plea with the State in which the State dropped the felony charge and Mr. Woods pleaded guilty to the misdemeanor charge in exchange for a term of probation. It appears that this offense was Mr. Woods' first and only conviction.
In August 2006, while on probation, Mr. Woods was arrested and charged with fleeing to elude a law enforcement officer, driving on a suspended license, carrying a concealed firearm, and felon in possession of a firearm. The facts and circumstances surrounding that arrest are not in the record on appeal.
Mr. Woods appeared for a first appearance hearing on August 20, 2006, by way of closed-circuit television. The physical layout of this closed-circuit proceeding is not well described in the record. It is clear, however, that Mr. Woods was in a room with closed-circuit television equipment at the Polk County Jail with the bailiff, and Judge J. Dale Durrance was presiding in the video courtroom at the Polk County Courthouse. The transcript of the first appearance hearing, including the entire "trial" in which Mr. Woods was found guilty of direct criminal contempt and sentenced to 179 days in jail, follows:
The above matter came on for a First Appearance Hearing on August 20, 2006, at the Polk County Courthouse, Bartow, Polk County, Florida before the Honorable J. Dale Durrance, Circuit Judge. Appearances were unknown esquire, for the State and unknown esquire, for the Defense.
THEREUPON, the following proceedings were had and taken:
THE COURT: Joseph Woods. Mr. Woods you're being held on a fleeing to elude a law officer, no bond. Driving with a suspended license, no bond. Carrying a concealed firearm in the commission of a felony, no bond. Possession of a firearm by a convicted felon, no bond. You've already asked for a Public Defender and they've been appointed to represent you.
THE DEFENDANT: Your Honor?
THE COURT: Sir?
THE DEFENDANT: I haveI have no felony how can I be a convicted felon? I never had a felony in my life. How *671 can Ihow can it be concealed weapon by a convicted felon?
THE COURT: Okay. You're not on felony probation?
THE DEFENDANT: III'mno timeI don't have a felony, I have a second degree misdemeanor on marijuana.
THE COURT: Okay. You're not on any probation?
THE DEFENDANT: Yes I'mI'm on probation.
THE COURT: Okay you're on probation. Okay.
THE DEFENDANT: Yes I'm on probation.
THE COURT: Alright. Well that's the reason we have a no bond. Who's your probation officer?
THE DEFENDANT: Mr. Robert Sparkman. But I'm asking about the felonlike convicted felon, I'm not a convicted felon.
THE COURT: Okay. Well your lawyer will get all that straightened out for you. Leave him under no bond with a showing of a violation of probation, notify his probation officer.
THE DEFENDANT: So what are you saying?
THE COURT: Okay. Thank you sir.
THE DEFENDANT: The state crooked
(Whereupon another case is called)
THE DEFENDANT: That what he saying.
THE BAILIFF: Be quiet.
THE DEFENDANT: Shit.
THE COURT: Okay call him back. Let me have that last one.
(Whereupon The Court addresses a different defendant)
THE COURT: Bring back Mr. Woods.
THE BAILIFF: Woods.
THE COURT: Mr. Woods
THE DEFENDANT: I'm right here.
THE COURT: as you were leaving the courtroom you said an obscene and a disrespectful and a rude comment in courtin open court.
THE DEFENDANT: I asked you what was you saying.
THE COURT: You want toyou want toyou want to show cause why I shouldn't hold you in contempt for that?
THE DEFENDANT: I just asked what was you saying. II'm asking was is you sayingwhat are you saying? I don't get what you're saying
THE COURT: No sir. No. I heard what
THE DEFENDANT: I don't got noI don't have a lawyer so how can my lawyer explain something to me?
THE COURT: Let me explain Mr. Woods. I saw you and I heard you what you said and we have it on film and on audio. So we've got a film of it. You want to show cause why I shouldn't hold you in contempt?
THE DEFENDANT: No you shouldn'tno you should not hold me in contempt.
THE COURT: Why shouldn't I?
THE DEFENDANT: I'mI was aggravated. I'm very aggravated at this time right now.
THE COURT: Okay. You're agitated and you're aggravated, that's no excuse for showing that rude and disrespectful behavior. I find that you're in contempt. I'll adjudicate you in contempt. I'll sentence you to 179 days in the county jail. Get him out of there.
Following this hearing the trial court entered a form order entitled "Order Following (Remote) First Appearance Hearing." *672 In addition to noting the four charges for which the court found probable cause and set no bond, the court clerk hand-wrote the following: "5) Contempt of CourtNo BondSee Snapout." On a line for comments, the court clerk added: "&utri; hollard [sic] `shit' on leaving Ct.Rm Ct held OTSC hearing on him &utri; held in contempt adj'dsentenced to 179 days county jail." Judge Durrance then signed this form, and we are now called upon to review it as a judgment and sentence of direct criminal contempt.

II. TWO PRELIMINARY COMMENTS
We begin with two preliminary comments. The first concerns the Tenth Judicial Circuit's continuing practice of using "snap-out" or form orders despite continued criticism leveled against this practice. The second concerns the circuit court's acknowledged practice of denying bond in all cases in which a new offense is alleged to also be a violation of probation.
There has been a long-standing practice in the Tenth Judicial Circuit of entering final orders in criminal cases on "snap-out" forms. This case is only the most recent in a series of cases in which such forms have been used improperly.[1] The use of such forms is particularly inappropriate when the form is used for a purpose other than the one for which it was created. Here the court used a standard form intended to record the results of first appearance hearings to act as a judgment and sentence on a new and distinct criminal charge.[2] If this court had the power to do so, it would order the Tenth Judicial Circuit to cease and desist in the use of this type of form final order. See, e.g., Heath v. State, 840 So.2d 307 (Fla. 2d DCA 2003) (denying second-tier certiorari review of the use of county court snap-out orders as judgments and sentences because established case law discouraged but stopped short of prohibiting the use of such forms). The power to regulate this matter of procedure, however, lies with the supreme court. In this case, we simply reverse yet another misused form that may have provided an economic benefit to the circuit court, but only at the expense of an individual's legal rights.
Second, this case is an example of the Tenth Judicial Circuit's apparently regular practice of denying bond to anyone who could be subject to a violation of probation, whether felony probation or misdemeanor probation. The legal authority to do this is not entirely obvious to this court. Other courts within this district do not seem to share this interpretation of the law. This practice is questionable for several reasons.
It appears from our record that at the time of the first appearance hearing, Mr. Woods had not been charged with violating his probation. The court was thus considering the propriety of pretrial detention or release in the context of the new charges. Article I, section 14, of the Florida Constitution provides:
Pretrial release and detention.Unless charged with a capital offense or an offense punishable by life imprisonment *673 and the proof of guilt is evident or the presumption is great, every person charged with a crime or violation of municipal or county ordinance shall be entitled to pretrial release on reasonable conditions. If no conditions of release can reasonably protect the community from risk of physical harm to persons, assure the presence of the accused at trial, or assure the integrity of the judicial process, the accused may be detained.
Section 907.041(4), Florida Statutes (2006), sets forth circumstances in which a court can require pretrial detention, and section 907.041(4)(c)(6) permits pretrial detention if a defendant was on probation at the time the charged offense was committed. Pursuant to Florida Rule of Criminal Procedure 3.131(b)(1), however, the court must "conduct a hearing to determine pretrial release" unless the State has filed a motion for pretrial detention pursuant to Florida Rule of Criminal Procedure 3.132. See also Duffy v. Crowder, 960 So.2d 909 (Fla. 4th DCA 2007). Even if the State seeks pretrial detention, article I, section 14, still requires the court to permit pretrial release upon reasonable conditions unless no conditions of release can reasonably protect the community from risk of physical harm to persons, assure the presence of the accused at trial, or assure the integrity of the judicial process.
Even if Mr. Woods had been charged with a violation of probation rather than or in addition to a new offense, detention without bail or other conditions is not automatic. Section 948.06(2)(c), Florida Statutes (2006), and rule 3.790(b) provide courts with the discretionary power to grant or deny bail to individuals who are charged with violating their probation. See, e.g., Bennington v. Thornton, 370 So.2d 856 (Fla. 4th DCA 1979). In Glosson v. Solomon, 490 So.2d 94, 95 (Fla. 3d DCA 1986), the Third District specifically held that a trial judge's announced policy of never setting bail on a probation violation charge is in derogation of section 948.06 and therefore error.
It appears, therefore, that the circuit court's stated practice of automatically requiring the detention of a defendant who has committed new offenses while on probation is error and should not continue. These two considerations aside, we turn to the errors specifically requiring reversal of the judgment and sentence for direct criminal contempt.

III. THE DEFICIENT JUDGMENT
Rule 3.830 mandates that in cases of direct criminal contempt the judgment of guilt shall "include a recital of those facts on which the adjudication of guilt is based." See also Stahl v. State, 906 So.2d 354 (Fla. 2d DCA 2005); Osborne v. State, 430 So.2d 551 (Fla. 2d DCA 1983). The rule is not discretionary. It serves a necessary purpose because the contemptuous conduct may well be in the form of statements or actions that are not part of a court proceeding and that are not recorded. Gidden v. State, 613 So.2d 457, 460 (Fla.1993). Here, the court clerk's scribblings on the snapout do not provide a sufficient recital of facts to permit a reasonable assessment of whether conduct occurred sufficient to support a finding of direct criminal contempt. As discussed below, the transcript of this proceeding coupled with the clerk's notations are insufficient to establish conduct falling within the narrow range of conduct constituting direct criminal contempt. At a minimum, we are required to reverse for the trial court to make the appropriate findings.

IV. RIGHT TO COUNSEL
At the beginning of this first appearance hearing, the court held that Mr. *674 Woods was indigent and explained to Mr. Woods that the public defender had been appointed to represent him. Nevertheless, the lawyer of record is listed as "unknown esquire," and there is no further indication of an attorney for Mr. Woods even after he asks: "I don't got noI don't have a lawyer so how can my lawyer explain something to me?"[3] Under these circumstances, if any lawyer was present for the representation of indigent defendants, that attorney did not represent Mr. Woods in this proceeding.
The trial court's failure to ensure that Mr. Woods actually had counsel present to represent him regarding the alleged direct criminal contempt violates the Florida Rules of Criminal Procedure, even if it is unclear whether that action violates federal constitutional law. Although the constitutional dimension of this issue is worthy of careful consideration, the issue in this case is actually resolved by the requirements of a lowly rule of criminal procedure.
The Florida Rules of Criminal Procedure apply in all criminal proceedings in Florida state courts "including proceedings involving direct and indirect criminal contempt." Fla. R.Crim. P. 3.010; see also Burk v. Washington, 713 So.2d 988, 992, 995 (Fla.1998) (recognizing that all of the Florida Rules of Criminal Procedure are applicable to direct and indirect criminal contempt proceedings pursuant to rule 3.010 unless otherwise specified; modifying the speedy trial rule to render it inapplicable to future cases of criminal contempt). Rule 3.111(a) provides for appointment of counsel at first appearance, and rule 3.111(b) requires counsel for indigent persons in all prosecutions for offenses punishable by incarceration. In this case, the trial court had appointed counsel to represent Mr. Woods, but these rules required the court to also assure that Mr. Woods was actually represented by that counsel at the hearing on the order to show cause. See Hayes v. State, 592 So.2d 327 (Fla. 4th DCA 1992).[4]
While we conclude that the Florida Rules of Criminal Procedure required the availability of appointed counsel for this direct criminal contempt prosecution, we acknowledge that the trial court's failure to provide counsel to Mr. Woods may not rise to the level of a constitutional violation. The constitutional right to counsel in a direct criminal contempt case has been a difficult and, at least to some degree, unresolved issue for many years.
In 1925, in Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), *675 the United States Supreme Court held that certain instances of direct criminal contempt could be summarily punished without the assistance of counsel for the defendant. Id. at 534, 45 S.Ct. 390. Several years later, in In re Oliver, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948), the Court further explained that "[t]he narrow exception to these due process requirements includes only charges of . . . [direct criminal contempt, in which] immediate punishment is essential to prevent `demoralization of the court's authority before the public.'" Id. at 275., 68 S.Ct. 499
Cooke and In re Oliver, however, were decided on the basis of due process, at a time when the Sixth Amendment right to counsel was not applicable to state courts. See Betts v. Brady, 316 U.S. 455, 461, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942) (holding that the Sixth Amendment of the United States Constitution only applies in federal court), overruled by Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). In Gideon, the Supreme Court found the Sixth Amendment guarantee of counsel to be a fundamental right made obligatory upon the states via the Fourteenth Amendment. Id. at 342-45, 83 S.Ct. 792. Accordingly the court determined that an indigent criminal defendant has a right to appointed counsel in all state court felony proceedings and reversed a conviction obtained in violation of that right. Id. This right was further extended in Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), where the Supreme Court held that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." Id. at 37, 92 S.Ct. 2006.
Argersinger did not explicitly overrule In re Oliver.[5] Thus, some question remains whether the right to counsel guaranteed by the Sixth Amendment as recognized in Argersinger applies to some or all cases of direct criminal contempt in which the sentence includes incarceration. Within Florida it appears that only the First District has expressly considered this issue, concluding that In re Oliver still applies despite Argersinger. See Saunders v. State, 319 So.2d 118, 125 (Fla. 1st DCA 1975). Other districts, including this court, have continued to apply the holding of In re Oliver without citing Argersinger or discussing its implications. See, e.g., Stahl, 906 So.2d 354, 354; Bryant v. State, 851 So.2d 823, 824 (Fla. 2d DCA 2003); Forbes v. State, 933 So.2d 706, 711-12 (Fla. 4th DCA 2006); Roundtree v. State, 651 So.2d 1286, 1287 (Fla. 3d DCA 1995). However, while this district in Stahl and the Fourth District in Forbes each applied In re Oliver despite Argersinger, both courts have questioned that result in unrelated opinions. See Kelley v. Rice, 800 So.2d 247, 254 n. 6 (Fla. 2d DCA 2001); Hayes v. State, 592 So.2d 327, 328-29 (Fla. 4th DCA 1992).
Even if In re Oliver permits a prosecution without the necessity of affording an indigent defendant counsel, notwithstanding the right to counsel recognized by Argersinger, that prosecution must meet the narrow exception to certain due process rights recognized by In re Oliver. The opinion itself provides:
The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under *676 the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent "demoralization of the court's authority before the public."
In re Oliver, 333 U.S. at 275, 68 S.Ct. 499; see also Kelley, 800 So.2d at 254.
The ability to summarily punish a direct criminal contempt without the protections normally accorded to the accused, therefore, depends in part upon the egregiousness of the accused's behavior. As discussed further in this opinion, we are not convinced that Mr. Woods' use of a single profane word during a closed-circuit television hearing constituted direct criminal contempt, much less the type of misconduct requiring immediate punishment to prevent a demoralization of the court's authority.[6] Certainly, the trial court never made a finding that this was the case.
Based upon current precedent, we do not hold that the trial court deprived Mr. Woods of a Sixth Amendment right to counsel. The content of the Florida Rules of Criminal Procedure prudently avoids this constitutional issue when the court seeks to adjudicate an indigent defendant guilty of direct criminal contempt and impose a sentence of incarceration.

V. THE ISOLATED PROFANITY IN THIS CASE WAS NOT ESTABLISHED TO BE CONTEMPTUOUS
In Emanuel v. State, 601 So.2d 1273 (Fla. 4th DCA 1992), the Fourth District explained:
The power to punish direct criminal contempt is one of the most unusual of judicial powers: the judge who was the object or butt of the allegedly contemptuous conduct becomes the prosecutor and then sits in judgment over the very defendant who is said to have just assailed the judicial dignity. That precise circumstance is condoned nowhere else in the law. For that reason, the power must be cautiously and sparingly used.
Id. at 1274 (quoting Fabian v. State, 585 So.2d 1158, 1158 (Fla. 4th DCA 1991) (Farmer, J., dissenting)).
Further, in a case very similar to this one, Schenck v. State, 645 So.2d 71 (Fla. 4th DCA 1994), the Fourth District cautioned:
[J]udges should approach the possible exercise of this unique power with the same hesitant caution and wariness one would use in picking up a glowing ember. It must be used only rarely and with circumspection. The provocation must never be slight, doubtful, or of shifting interpretations. The occasion should be real and necessary, not murky, and not ameliorated in some less formal manner.
Id. at 74 (citations omitted). The trial court in this case did not approach this exercise of power with such caution and wariness.
In Thomson v. State, 398 So.2d 514 (Fla. 2d DCA 1981), we defined contempt as "[a]n act which is calculated to embarrass, hinder, or obstruct a court in the administration of justice, or which is calculated to lessen its authority or dignity." Id. at 517. Intent is an essential element of contempt. See Fla. Ventilated Awning Co. v. Dickson, 67 So.2d 218, 219 (Fla.1953).
*677 There is no question that the use of profanity in a courtroom can constitute direct criminal contempt. See, e.g., Peters v. State, 626 So.2d 1048, 1049 (Fla. 4th DCA 1993) (holding that defendant's conduct constituted direct criminal contempt where defendant said, "Don't need this shit," in response to the judge's pronouncement of his sentence); Saunders v. State, 319 So.2d 118, 122-25 (Fla. 1st DCA 1975) (affirming adjudication for direct criminal contempt where defendant called the judge a "son-of-a bitch" as he was being escorted out of the courtroom); see also Woodie v. Campbell, 960 So.2d 877 (Fla. 1st DCA 2007). In Martinez v. State, 339 So.2d 1133, 1134 (Fla. 2d DCA 1976), we affirmed a judgment and sentence for direct criminal contempt where a defendant, while arguing with the judge, exclaimed: "That's a bunch of bull shit."
However, in Ippolito v. State, 678 So.2d 381 (Fla. 2d DCA 1996), we explained that an isolated remark will only be considered contemptuous if it "constitute[s] an imminent, not merely a likely, threat to the administration of justice." Id. at 383-84 (quoting Eaton v. City of Tulsa, 415 U.S. 697, 698, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974)). "The test is not the physical propinquity of the act to the court, but its tendency to directly affect the administration of justice." Ex parte Crews, 127 Fla. 381, 173 So. 275, 279 (1937). Thus, a court, in determining whether an isolated comment constitutes an imminent threat, must look not at the "vehemence of the language used . . . [but the] fires which it kindles." Craig v. Harney, 331 U.S. 367, 376, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947).
This appears to be the first case involving profanity before a video camera in a room that is actually inside a jail. For the purposes of this case, we assume without deciding that misconduct at the opposite end of a closed-circuit television network, which occurs miles away from the presiding judge, can constitute direct criminal contempt if the trial judge saw or heard the misconduct from his or her end of the connection. At a minimum, the use of such equipment for purposes of first appearance would seem to further complicate the issues surrounding this procedurally unusual crime.
From the record, it is obvious that Mr. Woods became upset because the trial court would not explain how he could be charged with being a felon in possession of a firearm when he was not a felon. He did not understand the trial court's practice to set no bond if someone was on any form of probation. The transcript of these proceedings suggests that Mr. Woods uttered the single word "shit" as he was leaving the proceedings. We cannot tell from this record, however, when or how Mr. Woods said the single word of profanity. We do not know the volume or tenor of his voice. We do not know whether he was looking at the judge on the television set or at the back-door of the room. We do not know whether his comment was directed at the judge, the bailiff, or to no one in particular. We do not know whether there was an audience for this behavior other than the judge and bailiff, or whether Mr. Woods was playing to such an audience. The trial judge characterized the statement as merely "rude and disrespectful behavior."
We do not question that the use of this word was rude and disrespectful. However, an intent beyond mere rudeness was required before the court could adjudicate Mr. Woods guilty of direct criminal contempt. The trial court had to establish that Mr. Woods' statement, coupled with his actions, were intended to constitute an imminent threat to the administration of justice. Woodie, 960 So.2d at 879. The order contains no recital of facts to support such a conclusion.
*678 We doubt that such an intent can be proven in this case. The record suggests that Mr. Woods' isolated expletive was spontaneous and not necessarily directed at the judge. Although his actions were inappropriate, in context Mr. Woods' frustration is somewhat understandable given that he was charged with being a felon in possession of a firearm though he had never been convicted of a felony. Nevertheless, we cannot rule out the possibility that a more thorough description of Mr. Woods' words and actions could establish a direct criminal contempt suitable for punishment. Therefore, although we reverse the judgment and sentence based upon the procedural irregularities, we remand for further proceedings. If a videotape of this event still exists and the delays caused by the trial court's numerous errors have not unduly prejudiced Mr. Woods' ability to answer to these charges, the trial court may reconsider the charge of direct criminal contempt after appointing counsel to represent Mr. Woods. It may only adjudicate Mr. Woods guilty of this offense, however, if it can establish beyond a reasonable doubt that Mr. Woods' conduct fell within the narrow range of conduct constituting direct criminal contempt discussed in this opinion.
Reversed and remanded.
NORTHCUTT, C.J., Concurs.
LaROSE, J., Concurs in result only.
NOTES
[1] See Akridge v. Crow, 903 So.2d 346 (Fla. 2d DCA 2005); Sutton v. State, 838 So.2d 616 (Fla. 2d DCA 2003); Gordon v. State, 827 So.2d 346 (Fla. 2d DCA 2002); Braswell v. State, 804 So.2d 523 (Fla. 2d DCA 2001); Monroe v. State, 760 So.2d 289 (Fla. 2d DCA 2000); Grantham v. State, 735 So.2d 525 (Fla. 2d DCA 1999); Peterson v. State, 730 So.2d 830 (Fla. 2d DCA 1999); Donley v. State, 557 So.2d 943 (Fla. 2d DCA 1990).
[2] This practice contradicts Florida Rule of Criminal Procedure 3.986(a), which requires the use of standard forms for judgments and sentences "by all courts."
[3] Irrespective of the direct criminal contempt proceedings, the seeming absence of any available counsel on the pending charges also suggests a violation of Rule 3.130(c), particularly once Mr. Woods questioned the charges against him and sought to challenge the denial of bond. This rule requires the court to make a determination as to the defendant's rights to and desire for appointed counsel "no later than the time of the first appearance and before any other proceedings at the first appearance." Rule 3.130(c)(3) specifically requires, "No further steps in the [first appearance] proceedings should be taken until the defendant and counsel have had an adequate opportunity to confer, unless the defendant has intelligently waived the right to be represented by counsel."
[4] We acknowledge that in Stahl, 906 So.2d 354, we rejected an argument that Stahl was denied his right to counsel in a direct criminal contempt proceeding. There, however, the issue raised was the constitutional right to counsel, an issue we discuss in this case without coming to any further conclusions. The application of the Florida Rules of Criminal Procedure was not discussed in Stahl and apparently not argued in that case. Further, unlike Mr. Woods, it does not appear that Stahl was an indigent defendant entitled to appointed counsel in a pending criminal case.
[5] It seems unlikely that the court overlooked In re Oliver, however, because the case was cited within the opinion. See Argersinger, 407 U.S. at 27-28, 92 S.Ct. 2006.
[6] Some cases have recognized a right to counsel in direct criminal contempt cases where the matter did not require immediate resolution to maintain control of the courtroom. See, e.g., Brooks v. United States, 686 A.2d 214, 221 (D.C.Cir.1996) (holding that there is a right to counsel, even in direct criminal contempt cases, unless "the conduct complained of [is] `so outrageous and disruptive' that it threatens the conduct of business in the courtroom and will not abate without immediate action").