LAGOA, J.
(concurring in part; dissenting in part).
Alexander J. Michaels (“Michaels”), an attorney, was found in direct criminal con *329 tempt by the trial court, and sentenced to two days incarceration. For the following reasons, I respectfully dissent as I would grant the petition and vacate the judgment and sentence in its entirety.
I. FACTUAL HISTORY
The direct criminal contempt charges stem from alleged conduct that occurred on the final day of a three-day probation violation hearing. Michaels represented the probationer. Because of Michaels’s behavior throughout the hearing, the trial court admonished him on several occasions to proceed in a respectful manner toward the trial court, witnesses, and attorneys.
On the last day of the hearing, May 17, 2013, Michaels was conducting the re-direct examination of a witness, when the Assistant State Attorney, Michael Von Zamft (“Von Zamft”), objected, and the following exchange occurred:
MR. MICHAELS: There was a phone call from — was there.
MR. VON ZAMFT: Objection, Your Honor. This is also outside the scope of cross.
MR. MICHAELS: Let’s talk about the gap between 8:15 and 4:33. There is no gap. There’s a communication. Can I finish?
THE COURT: Go ahead. There is a gap.
MR. VON ZAMFT: Your Honor, he threatens me one more time, I’m going to deal with him in a different way. I’m going to ask the Court to hold this man in contempt and potentially baker act him. I have case law to substantiate your right to substantiate the contempt.
THE COURT: I have the case law. I just want to address to [sic] things before I address the issue.
MR. MICHAELS: You are talking to me. I asked him not to interrupt. He continue [sic] to interrupt. I raised my voice at him to be quiet.-
THE COURT: That’s not the conduct I’m referring to. The raising of the voice I tolerated. It was the hand gesture and what was mouthed.
MR. MICHAELS: Nothing was mouth.
(Emphasis added)
After the above exchange, further discussion occurred and the trial court stated that it was going to conduct a hearing to show cause for direct criminal contempt for the “actions I’ve described to you making rude and violent gestures toward the prosecutor and mouthing the words ‘f* *k you’ to the prosecutor in my presence ... which I saw.”
After a brief recess, the trial court conducted a hearing on the direct criminal contempt charge. During the contempt hearing, Michaels was represented by counsel. Nine witnesses testified, including the two assistant state attorneys (Von Zamft and Stephen Mitchell) and Mi-chaels.[4]
All of the witnesses testified that Mi-chaels was standing at the podium examining a witness when Von Zamft made an objection. In response to the objection, Michaels raised his voice and said words to the effect of “let me finish.” While making that statement, Michaels extended his right arm with his palm facing outward and in the direction of Von Zamft. Immediately thereafter, Von Zamft, angry and red-faced, stood from the prosecution table, walked to the prosecution’s podium, made a fist which he shook at the direction of Michaels and asked the trial court to *330 find Michaels in contempt “and potentially baker act him.”
Significantly, every witness, including Yon Zamft, testified that they did not hear Michaels say the obscenity referred to by the trial court, i.e., “f* *k you” or see him mouth any words. They also uniformly testified that Michaels did not make an inappropriate, violent or physical hand gesture.
Michaels, however, testified that he did mouth offensive words, but he did so in Romanian, because “I learn over the years, not in court to use the English word f* *k you.”[5]
At the conclusion of the contempt hearing, the trial court found Michaels in direct criminal contempt of court, and sentenced him to two days in jail. On that same day, the trial court entered a written judgment of contempt (“Order 1”), finding direct criminal contempt:
IT APPEARING TO THIS COURT that you have been found guilty of DIRECT CRIMINAL CONTEMPT OF COURT for FOUL LANGUAGE AND DISRESPECT TO THE COURT, inappropriate violent gestures, all of which obstructed the proceedings and administration of Justice. Including mumbling “F* *k you” at the podium. It is therefore ORDERED AND ADJUDGED that you are and stand convicted of Contempt of Court.
The trial court proceeded to enter a second order (“Order 2”), stating:
[Tjhat Alexander Michaels was in violation of a direct court order to conduct himself in a respectful and professional manner, that he violated that order by using foul language, To Wit: “F* *k You” and or the equivalent term in Romanian, as well as using violent and offensive physical gestures in an effort to obstruct the proceedings and the administration of Justice before this court and did in fact disrupt this Court. All conduct occurred in the presence of this court.
ORDERED AND ADJUDGED that Alexander Michaels is to stand conviction [sic] of Contempt of Court and is sentences [sic] to two days in the Dade County Jail.
(emphasis added).
On Friday, May 17, 2013, at 4:50 p.m., the trial court concluded the contempt hearing and ordered Michaels taken into custody to immediately begin serving the *331 two-day sentence. Counsel for Michaels asked the trial court for a stay in order to appeal the trial court’s finding of direct criminal contempt, which the trial court summarily denied. Counsel for Michaels also requested an appellate bond, which the trial court also summarily refused. An emergency petition for writ of habeas corpus was filed with this Court, and this Court stayed the trial court’s sentence pending further review of the emergency petition.
II. ANALYSIS
Criminal contempt is defined as “any act which is calculated to embarrass, hinder, or obstruct the court in the administration of justice, or which is calculated to lessen its authority or its dignity.” Ex parte Crews, 127 Fla. 381, 173 So. 275, 279 (1937). Criminal contempt requires some willful act or omission calculated to hinder the orderly functions of the court. See Davila v. State, 100 So.3d 262, 264 (Fla. 3d DCA 2012); Thompson v. State, 618 So.2d 781, 784 (Fla. 5th DCA 1993); Sewell v. State, 443 So.2d 164, 165 (Fla. 1st DCA 1983). The main purpose of the law of contempt is to “appropriately punish for an assault or an aspersion upon the authority and dignity of the court or judge.” Ex parte Earman, 85 Fla. 297, 95 So. 755, 760-61 (1923). “[T]he punishment must be appropriate to the offense and not excessive.” Id. at 760. The power to punish for criminal contempt must be exercised cautiously and sparingly. Carroll v. State, 327 So.2d 881 (Fla. 3d DCA 1976).
“The standard to be applied in determining whether conduct is contemptuous is an objective one based upon a determination of the conduct’s tendency to hinder the administration of justice, rather than a subjective one concerned with the sensitivities of a particular judge. Importantly, as noted [by the Florida Supreme Court in Ex parte Crews ] above, the conduct alleged to be contemptuous must be calculated to cause harm.” Murrell v. State, 595 So.2d 1049, 1050 (Fla. 4th DCA 1992) (emphasis in original). See also Ex parte Earman, 95 So. at 762-63 (objective standard means that judge’s subjective perception of conduct will not satisfy requirement for holding an individual in direct criminal contempt). Moreover, where a judgment of contempt is not objectively supported by the court transcripts, it is procedurally defective. See Krueger v. State, 351 So.2d 47 (Fla. 3d DCA 1977). Direct criminal contempt must be proven beyond a reasonable doubt. McRoy v. State, 31 So.3d 273, 274 (Fla. 5th DCA 2010); Braisted v. State, 614 So.2d 639, 640 (Fla. 4th DCA 1993).
Florida Rule of Criminal Procedure 3.830 gives the trial court the authority to punish a criminal contempt “summarily if the court saw or heard the conduct constituting the contempt committed in the actual presence of the court.” Fla. R. Crim. P. 3.830; accord Gidden v. State, 613 So.2d 457, 460 (Fla.1993) (“Direct criminal contempt results from conduct committed in the actual presence of a judge and, consequently, may be punished summarily by the judge who saw or heard the conduct constituting the contempt.”).
Rule 3.830, however, requires that a judgment of direct criminal contempt “shall include a recital of those fadts upon which the adjudication of guilt is based.” Gidden, 613 So.2d at 459. “Purely conclu-sory statements will not meet the requirement of a recitation of facts. For example, citing the contemnor’s ‘unjudicious, unethical and intemperate conduct before the court’ is insufficient.” McRoy, 31 So.3d at 274-75.
With respect to the orders entered by the trial court, Michaels was found in direct criminal contempt for two acts that *332 allegedly occurred during the same time period. Specifically, Michaels was found in direct criminal contempt for: (1) “inappropriate violent gestures” (Order 1) and “violent and offensive physical gestures” (Order 2); and (2) “mumbling “F* *k you” at the podium” (Order 1) and “using foul language, To Wit: ‘F* *k you’ and or the equivalent term in Romanian.” (Order 2).
With respect to the first act, I concur in reversing the conviction of direct criminal contempt as there is no evidence that Michaels used “inappropriate violent gestures” or used “violent and offensive physical gestures.” The record shows that Michaels raised his arm in response to an objection. Every witness — including the witness on the stand at the time of the incident, the two assistant state attorneys (including Von Zamft), and the judicial assistant of another trial court judge who was present in the courtroom at the time of the incident — testified that Michaels did not make an inappropriate, violent or physical hand gesture.
Despite this uniformly consistent and unrebutted testimony, the trial court found Michaels in direct criminal contempt for “inappropriate violent gestures” (Order 1) and for “using violent and offensive physical gestures.” (Order 2) The trial court further found that these gestures “obstructed the proceedings and administration of justice.” These findings are unsupported by any of the sworn testimony, and do not come close to' meeting the standard for holding an individual in direct criminal contempt. Indeed, since it is undisputed that Michaels did not obstruct the proceeding or the administration of justice with any improper physical gestures, there is no evidence that improper physical gestures by Michaels embarrassed, hindered or obstructed the court in the administration of justice. Instead, the record suggests that the only individual who may have obstructed and disrupted the proceedings was Von Zamft, who had to be restrained by his co-counsel. Accordingly, because the judgment of contempt regarding improper physical gestures is not objectively supported by the record, the judgment is procedurally defective and cannot sustain a conviction for direct criminal contempt.
Concerning the second act, the mouthed obscenity, the law is clear that while the use of an obscenity in a courtroom may be contemptuous, see Peters v. State, 626 So.2d 1048, 1049 (Fla. 4th DCA 1993), not “every profane utterance made in the courtroom is automatically contemptuous. [Indeed] [t]he challenged statements must be viewed in the context in which they were made.” Martinez v. State, 339 So.2d 1133, 1135 (Fla. 2d DCA 1976). Factors to be considered include whether the obscenity was heard in the courtroom, whether it was directed at the court, and whether the language hindered the ordinary function of the trial court. See Davila, 100 So.3d at 263 (reversing conviction for direct criminal contempt where defendant said “[f]* *k this court” under his breath, it was not heard by the trial court, and it did not interrupt proceeding); Woodie v. Campbell, 960 So.2d 877, 878 (Fla. 1st DCA 2007) (finding no direct criminal contempt where trial court did not hear appellant say one-word expletive directed toward the trial court and it did not interrupt ordinary function of the trial court; “To constitute direct criminal contempt, however, the profane statement must be heard by the court and committed in the court’s actual presence.”); Bryant v. State, 851 So.2d 823 (Fla. 2d DCA 2003) (granting petition for writ of habeas corpus and vacating judgment and sentence for direct criminal contempt where petitioner’s foul language was not directed toward the trial court or the judicial proceedings); Payne v. State, 486 So.2d 74 (Fla. 4th DCA 1986) (reversing *333 direct criminal contempt conviction where judge heard one-word expletive, not the alleged comment which two witnesses claimed to have heard).
Applying the requisite objective standard, the record does not support a finding that an isolated, inaudible utterance in Romanian that was not directed at the trial court is sufficient to sustain a finding of direct criminal contempt. While Michaels admits that he mouthed an obscenity in Romanian under his breath during the hearing, it is undisputed that every witness testified that they did not hear Mi-chaels’s utterance. Moreover, the isolated utterance was done after opposing counsel had interrupted Michaels’s questioning, walked up to the podium, shook his fist at Michaels, and threatened to move to have Michaels involuntarily committed under the “Baker Act.”
Additionally, there is nothing in the record to indicate that the utterance was directed at the trial court, nor is there anything in the record to establish how the trial court translated Mi-chaels’s mumbled utterance from Romanian to the English obscenity quoted in its orders. Indeed, the trial court’s two orders make it clear that the trial court is not even sure whether Michaels muttered “F* *k you” or whether he said something in Romanian. The trial court’s uncertainty confirms the failure to satisfy the “beyond a reasonable doubt standard” required for finding an individual in direct criminal contempt. Because the power of contempt must be exercised rarely and cautiously, “[t]he provocation must never be slight, doubtful or of shifting interpretations. The occasion should be real and necessary, not murky, and not ameliorated in some less formal manner.” McRoy, 31 So.3d at 275; Davila, 100 So.3d at 264.
The trial court’s order also warrants reversal as the record lacks the necessary intent required to sustain a finding of direct criminal contempt. “Criminal contempt requires some willful act or omission calculated to hinder the orderly functions of the court.” Davila, 100 So.3d at 264 (emphasis added). See also Woods v. State, 987 So.2d 669, 677 (Fla. 2d DCA 2007) (“[A]n intent beyond mere rudeness was required before the court could adjudicate Mr. Woods guilty of direct criminal contempt. The trial court had to establish that Mr. Woods’ statement, coupled with his actions, were intended to constitute an imminent threat to the administration of justice.”); Woodie, 960 So.2d at 878-79 (“Criminal contempt requires some willful act or omission calculated to hinder the orderly functions of the court.”). See generally Ex parte Earman, 95 So. at 762-63 (direct criminal contempt cannot be sustained where record did not establish intent to embarrass the court in the administration of justice).
Significantly, nothing .in the record establishes beyond a reasonable doubt that Michaels intended to disrupt or hinder the court proceeding by his inaudible utterance in Romanian. There is no evidence that Michaels’s isolated utterance was “calculated to cause harm” — a prerequisite for a finding that the conduct charged is contemptuous; and the record is also devoid of any evidence of willful or deliberate intent to disrupt. In fact, the record evidence is to the contrary. Under oath, Michaels testified that he mouthed a profanity in Romanian, and not in English, because he did not want to interrupt the proceedings or be offensive. Moreover, Michaels was reacting to Von Zamft’s threat to Baker Act him, and Von Zamft’s physical behavior that required his fellow assistant state attorney to physically restrain him, not any statement or ruling by the trial court. See, e.g., Davila, 100 So.3d at 264 (during contempt hearing, defen *334 dant explained that he was frustrated by the system and his situation so that his statement “F* * ⅜ the court” was not calculated “to hinder the functions of the court, but merely spoke[n] out of understandable frustration”); Woods, 987 So.2d at 678 (defendant’s expletive “is somewhat understandable given that he was charged with being a felon in possession of a firearm though he had never been convicted of a felony”). See also Ex parte Earman, 95 So. at 762 (unrebutted testimony under oath established lack of intent and therefore could not sustain adjudication of direct criminal contempt).
“Contempt does not exist just because a judge feels aggrieved or vexed.” McRoy, 31 So.3d at 274; see also Ex parte Earman, 95 So. at 762-63. As this Court has previously held, “[i]n the absence of any evidence of willful or deliberate intent to disrupt, it should be rare that the mere use of a word or phrase which may have negative or distasteful connotations will be sufficient to constitute criminal contempt.” Davila, 100 So.3d at 264 (quoting Murrell v. State, 595 So.2d 1049, 1051 (Fla. 4th DCA 1992)). In reversing the finding of criminal contempt, this Court in Davila found that “when given the chance to explain, Davila stated that he was frustrated with the system and his situation and didn’t mean to ‘come in that form and tone.’ This clearly shows that Davila did not calculate to hinder the functions of the court, but merely spoke out of understandable frustration.” Id. at 264. Here, as in Davila, the record fails to show that Mi-chaels intended to hinder the functions of the court. Indeed, as in Davila, when given the chance to explain his conduct Michaels testified that when he becomes frustrated he reverts to his native language, Romanian, so that he will not be offensive. The unrebutted testimony under oath, therefore, established that Mi-chaels lacked the intent necessary to be found in direct criminal contempt.
Additionally, the ability of the trial court to continue with its normal functions after the alleged contemptuous conduct occurred weighs against any finding that the conduct hindered the administration of justice. See Woodie, 960 So.2d at 879 (calling judge a “stupid bitch” as defendant walked past counsel table “did not interrupt or hinder the orderly functions of the court, as the trial court had moved on to another hearing”); Davila, 100 So.3d at 264 (defendant’s utterance of “F* * * this court” under his breath did not interrupt the proceedings or hinder administration of justice where trial court moved on to next case without hesitation). See also Ex parte Earman, 95 So. at 763 (A letter allegedly accusing court of susceptibility to corruption did not hinder administration of justice where judge “did, in fact dispose of the case in due course within his judicial function. This shows that the judicial functions were not impeded.”). Here, the record shows that the trial court proceeded to sustain an objection after Michaels muttered the inaudible comment in Romanian.[6]
Notwithstanding the foregoing, the majority finds that an inaudible comment muttered in a foreign language that is not understood by the Court or any of those *335 present at the hearing, that was not directed at the bench, and that was made in response to opposing counsel’s inappropriate and disruptive behavior can form the proper basis for direct criminal contempt. Significantly, the majority’s opinion states that “there can be no question the conduct at issue [the mumble] hindered the trial court in the administration of justice.” As discussed above, none of the three cases cited by the majority—Ex parte Earman, Woodie, and Saunders[7] — support that conclusion.
In each of those cases, the contemptuous conduct was directed at the bench. That did not occur here. In Saunders, the only one of these three cases that affirmed a finding of direct criminal contempt, the defendant, after shaking his fist at the bench, called the trial court a “son-of-a-bitch” as he was being led out of the courtroom. This profanity was heard by the bailiff and transcribed by the court reporter. Nothing like that occurred here. Moreover, both Earman and Woodie found a lack of intent necessary to sustain a finding of direct criminal contempt. As discussed above, the record here is bereft of support for any such finding by the trial court, and, in fact, the only evidence on that point directly contradicts the conclu-sory statement in the trial court’s order. I, therefore, respectfully dissent as I do not believe that either the facts or the law provide a basis for the trial court’s orders finding Michaels in direct criminal contempt on this ground, and the majority’s decision is contrary to this Court’s opinions in both Davila and Krueger.
Finally, the trial court’s sentence of two (2) days imprisonment is directly contrary to the Florida Supreme Court’s mandate that the punishment must be appropriate to the offence and not excessive. “[T]he penalty should have reference to the nature and enormity of the act complained of and to the wrong done to the court.” Ex parte Earman, 95 So. at 761. Any imprisonment for an inaudible utterance not directed at the trial court, made in response to frustration with opposing counsel’s own behavior, and muttered in a foreign language unknown to either the trial court or any of the individuals present in the courtroom is not appropriate to the charged offense and is excessive.
Direct criminal contempt is a serious matter, and an officer of the court who manifests disdain for the bench and disrupts court proceedings and the administration of justice warrants being held in direct criminal contempt. Michaels’s actions, while unprofessional, do not merit that level of penalty. Indeed, his actions, as the witnesses present in the courtroom uniformly testified, did not disrupt or hinder the administration of justice. If anything, the record suggests that it was the behavior of Von Zamft that disrupted the proceedings that particular afternoon.
We do and should expect better behavior from attorneys licensed by the Florida Bar, and Florida trial courts are well within their discretion to deploy the various tools available to them in order to curtail and penalize the type of behavior that occurred that afternoon. In this instance, however, the trial court moved too quickly to mete out the severest penalty, direct criminal contempt and incarceration, as evidenced by the flaws in both of the orders. “Trial judges must be allowed to control their courtrooms. They must have the tools suitable to the purpose when the loss of control is threatened and the dignity and purpose of the court are challenged. However, because of the potency of the powerful remedy of criminal contempt, we must carefully guard the requirements for *336 its use, premised only on indisputable record support.” McRoy, 31 So.3d at 275.
III. CONCLUSION
“[T]he power to adjudge anyone with contempt is always to be exercised with care and circumspection.” State v. Clemmons, 150 So.2d 231, 234 (Fla.1963).
[Jjudges should approach the possible exercise of this unique power with the same hesitant caution and wariness one would use in picking up a glowing ember. It must be used only rarely and with circumspection. The provocation must never be slight, doubtful, or of shifting interpretations. The occasion should be real and necessary, not murky, and not ameliorated in some less formal manner.
Woods, 987 So.2d at 676 (quoting Schenck v. State, 645 So.2d 71, 74 (Fla. 4th DCA 1994) (citations omitted)).
Here, the requisite proof required for direct criminal contempt is sorely lacking. Because the record fails to support a finding of direct criminal contempt on both charged offenses, I would grant the petition for writ of habeas corpus, and remand with directions to the trial court to vacate the judgment and sentence for direct criminal contempt.

APPENDIX

The pertinent testimony of the seven witnesses not involved in the altercation, as well as the pertinent testimony of Von Zamft, is as follows:
1. Elizabeth Martin
Q. Were you here today when the incident that occurred with Mr. Michaels and Mr. Vonzamft?
A. Yes. Just to clarify I wasn’t here for some of the other days that this was going on, just today.
Q. Where were you seated when the incident occurred?
A. At the defense counsel table.
Q. Where was Mr. Michaels at that time?
A. At the podium.
Q. So his back was toward you?
A. Yes.
A. Correct.
Q. Does there come a time when Mr. Michaels was asking a question of one of the witnesses?
A. Yes.
Q. Had he completed the question at the time the assistant state attorney made an objection?
A. To my recollection, no.
Q. And what did Mr. Michaels do at that point?
A. He made a motion with his hand sort of like to shush Mr. Vonzamft.
Q. Did he say anything or just make the motion?
A. I don’t remember exactly what was said, but I know I saw the motion.
Q. Did you hear anything such as shut up or sit-down or anything like that?
A. No.
Q. What did Mr. Vonzamft do when that motion was made?
A. He stood up from the prosecution table. He came round the table to the podium. He started shaking with what looked like anger. His face got really red. He and Mr. Michaels started raising their voices at each other. He put his arm out in a fist.
Q. When you say “he put his arm out”?
A. Mr. Vonzamft put his arm out in a fist and Mr. Mitchell stood up from the table and physically pushed down Mr. Vonzamft’s arm.
*337 Q. During that entire situation that you just described did Mr. Michaels leave the podium he was at?
A. No.
Q. Did he make a fist or any threatening gesture toward Mr. Vonzamft.
A. No.
Q. Did you hear him utter any expletive profanity curse word?
A. No.

2. Karen Ruiz:

Q. Were you present today during the probation violation hearing with the incident between Mr. Michaels and Mr. Vonzamft?
A. Yes, I was.
Q. Where were you seated?
A. I was at the defense table.
Q. So, again Mr. Michael’s back was toward you?
A. Yes.
A. Correct.
Q. Did there come a time when Mr. Michaels was asking a question of one of the witnesses?
A. Yes.
Q. And was he interrupted in that questioning?
A. Yes, he was.
Q. By whom?
A. It was an objection by Mr. Von-zamft.
Q. What did Mr. Michaels do?
A. Mr. Michaels does what he always does. I’ve worked with him for the past three years. He does like that.
Q. You are indicating he put his hand up?
A. In a non-violent manner.
Q. With his hand open, with his palm showing?
A. It was never a fist, never anything. Just relax let me talk.
Q. So, possibly asking let me finish the question before you object?
A. Perhaps.
Q. What did Mr. Vonzamft do?
A. He got up from the table. He was very red, start rolling his eyes. He stood up. He says, If he continues on doing this, I’m going to have to handle this in my own way. Then he asked the judge to hold him in contempt, he need to be baker acted. Then upon Mr. Mitchell got up. I have no idea if Mr. Vonzamft was going to do something, then he put himself physically in the middle between Mr. Michaels and Mr. Vonzamft.
Q. During that little incident you just described, did Mr. Michaels leave the podium he was at?
A. He never left the podium. I know him very well. He actually calmed down. I know when he lowers his voice and he was very calm, very subdued. He was very relaxed. He never responded anything back.
Q. Again did you hear him utter any profanity, curses at anytime?
A. I never heard him.
Q. Did you hear him tell Mr. Vonzamft, tell him to shut up?
A. I never heard any of that.
3. Julie Santana:
Q. What is your name?
A. Julie Santana.
Q. How are you employed?
A. Judicial assistant.
Q. For whom?
A. Samantha Ruiz-Cohen.
Q. Were you here today watching the probation violation hearing?
A. Yes.
*338 Q. Did you witness the incident that we have been speaking about?
A. I did..
Q. Where were you seated?
A. Behind defense counsel on the second row.
Q. And again was Mr. Michaels here at the podium?
A. Yes.
Q. Was he asking questions of a witness?
A. He was.
Q. Was he at some point interrupted in one of those questions?
A. Yes, he was.
Q. By whom?
A. By Mr. Vonzamft.
Q. When he got interrupted in asking the question, what did Mr. Michaels do?
A. Mr. Michaels went like this with his hand.
Q. You are indicating he extended?
A. He extend his hand and went like that.
Q. With his palm outward?
A. Correct.
Q. He didn’t make a fist?
A. No.
Q. He didn’t shake it at him?
A. No.
Q. What was Mr. Vonzamft’s response?
A. Mr. Vonzamft got up from where he was sitting, said something, I’ll handle this my way, then requested that Mr. Michaels either be held in contempt or baker acted, at which time he made a fist. Mr. Michell, who is now smirking over there, stood up and held Mr. Von-zamft from approaching Mr. Michaels.
Q. During that incident, at anytime did Mr. Michaels leave the podium where he was standing at?
A. No, he did not.
Q. Did he make any fist or threatening gestures?
A. No, he did not.
Q. Did at anytime you hear Mr. Mi-chaels tell Mr. Vonzamft anything in the nature of shut up or anything like that?
A. No.
Q. Did you ever hear Mr. Michaels utter any profanity, expletive, curse words?
A. No, I did not.
MR. SPEILLER: No other questions.
THE COURT: Anything else. Okay. Miss Santana, you were here during the incident as well as the commentary after. Did you hear when Mr. Michaels in response to the Court’s question about why he had cursed before I had said what the words were. When Mr. Mi-chaels admitted to having cursed that it was in Romanian?
THE WITNESS: I heard that he said, What I said was in my own language. You wouldn’t be able to understand what I said, that’s what I heard.
THE COURT: Did you hear when he said whenever he curses or gets upset he uses his own language to not offend other people in the courtroom?
THE WITNESS: Again, what I heard him say was whenever I get mad I speak in Romanian, my own language.
THE COURT: Did you hear him speak in Romanian at the time?
THE WITNESS: No, I did not.
THE COURT: So if he had said something in Romanian, cursed in Romanian or English you wouldn’t have been able to hear it?
THE WITNESS: Correct.
THE COURT: Would you have been able to hear this mouthed?
THE WITNESS: No.
*339 4. Reginald, Hope:
Q. What is your full name?
A. Reginald Hope.
Q. How are you employed?
A. Private investigator.
Q. And you were the witness who was testifying when the incident occurred, correct?
A. Yes.
Q. And you were seated where you are seated now?
A. Yes.
Q. And Mr. Michaels was standing essentially where I am, correct?
A. Yes.
Q. So he was facing you head on?
A. Yes.
Q. Was there a point at which he was asking a question and was interrupted by the assistant state attorney?
A. Yes.
Q. When that happened what did Mr. Michaels do?
A. Actually Mr. Vonzamft made an objection and Mr. Michaels said, Wait until I’m done or something to that effect loud. In a loud voice. Mr. Vonzamft came from around the desk and said basically if you raise your voice at me again I’ll handle this in a different way and that’s when Mr. Mitchell came round.
Q. Did Mr. Vonzamft make any kind of motion?
A. I didn’t see it.
Q. Did you take his words as joking or threatening?
A. Naw, he was pretty upset.
Q. Did anybody try to stop Mr. Von-zamft?
A. Mr. Michell.
Q. How did he do that?
A. He just came from round the desk and kind of got between the two.
Q. During this entire little incident did Mr. Michaels ever leave the podium he was standing at?
A. No.
Q. Did he say anything to Mr. Von-zamft?
A. No.
Q. Did he make any threatening motions or gestures toward either Mr. Von-zamft or Mr. Mitchell, who is now in between them?
A. Wdien he was saying let me finish the question or something like that he kind of did like this.
Q. You are also indicating he extend his right hand with the palm out?
A. Yeah, like basically. He kind of yelled out, Let me finish the question.
Q. At any time during the incident did you hear Mr. Michaels utter any kind of expletive, profanity, curse words?
A. No.
Q. You were facing him during the entire time?
A. I was sitting here, but I was facing them.
Q. Did you at anytime—
THE COURT: Facing them as in the State.
Q. At anytime did you see Mr. Mi-chaels move his lips?
A. No.
Q. Do you have any indication that he uttered any kind of profanity, expletive?
A. No, I don’t because as I said I was facing the State.
Q. Was there anything he did that you took to understand as him cursing, issuing profanity or expletive?
A. No.
5. Margery Joseph:
Q. What is your name?
*340 A. Margery Joseph.
Q. And have you been here for the proceedings that were occurring today?
A. Yes.
Q. Where were you sitting?
A. Third row behind the defense.
Q. And Mr. Michaels was here at the podium?
A. Yes.
Q. Did you hear him when he was interrupted by the assistant state attorney?
A. Yes.
Q. Did he say anything in the nature of shut up or anything like that?
A. No.
Q. What did he do?
A. He made a hand gesture like this.
Q. Again you are indicating he extended his right hand with the palm out?
A. Extended his hand like this.
Q. He didn’t make a fist or shake it?
A. No.
Q. Did you see what the assistant state attorney did at that point?
A. Well, at that point he was still-sitting and talking and then after that he got up and come to the podium right there. He looks like he was mad and then he was talking to the judge, then this gentleman come by him, stood by him, and then he was asking the judge to baker act Mr. Michaels or held him in contempt.
Q. When you stated the other person got up between Mr. Michaels and Mr. Vonzamft, you are referring to the assistant state attorney, Mr. Mitchell?
A. Yes.
Q. At anytime did you hear Mr. Mi-chaels say any curse words?
A. No.
Q. When Mr. Vonzamft got up and approached him, did Mr. Michaels leave where he was standing?
A. No.
Q. Did he make any threatening gestures toward Mr. Vonzamft?
A. No.
6. Ashley Dale:
Q. What is your name, ma’am.
A. Ashley Dale.
Q. Have you been here through the proceeding today in this case?
A. Correct.
Q. And why are you here?
A. I’m here to support Devin Williams, in his case.
Q. Are you related to him?
A. No.
Q. Were you here when the incident occurred that we have been speaking about?
A. Correct.
Q. Where were you seated?
A. In the third row right next to Margery Joseph.
Q. Mr. Michaels was asking a question of the witness?
A. Correct.
Q. He was interrupted?
A. Correct.
Q. What did Mr. Michaels do at that point?
A. Mr. Michaels had a pen in his hand and he went like this to wave his— basically saying stop, at the same time his head was turned that way.
Q. Did he make a fist or any kind of threatening gesture toward Mr. Von-zamft?
A. No.
Q. Or anybody at the prosecution table?
A. No.
*341 Q. What did Mr. Vonzamft do at that point?
A. He got upset. I guess he was— after he objected, got upset, stood up, started shaking looking really red, walk round the table, came toward the podium, then I guess Mr. Mitchell — sorry I don’t know if that’s his name.
Q. The other gentleman sitting at the prosecution table?
THE COURT: Mr. Mitchell.
A. Came round the table as well and put his hands like this, like basically to stop him from what the other gentleman was doing with his hand.
Q. When you say put his hand like this—
A. Physically put his hand down.
Q. What you are saying is Mr. Mitchell forced Mr. Vonzamft’s fist down?
A. Correct.
Q. During that incident did Mr. Mi-chaels leave the podium where he was standing?
A. No.
Q. Did he say anything to Mr. Von-zamft?
A. From where I’m sitting, no. I did not see it, but as I remember saying when he first put his hand like that with his pen in his hand his head was faced that way.
Q. Inside the courtroom. I mean, if Mr. Michaels had been yelling would you have heard him?
A. He was not yelling. Only time he yelled when he was saying, Let me finish, when his head was turned that way.
Q. Only time he raised his voice was when he was interrupted and said let me finish?
A. Right.
Q. At any time did you hear Mr. Michael say any curse words?
A. No.
Q. At anytime did Mr. Michaels make any threatening moves or gestures toward the prosecution?
A. No, nothing was heard but from what I’m hearing it was mouth, but from where I’m sitting I can’t see anything being mouth from where I’m sitting.
Q. When you said that somebody made a fist, who was that?
A. The fist was coming from, I don’t know his name but the gentleman in the navy blue.
Q. At the prosecution table with the beard?
A. Yes.
Q. Mr. Vonzamft?
A. Yes.
7. Stephen Robert Mitchell:
Q. What is your full name?
A. Steven Robert Mitchell.
Q. You have been present throughout these proceedings and the probation violation hearing?
A. Yes.
Q. You don’t work for Mr. Michaels?
A. Absolutely not.
Q. Where are you employed?
A. Miami Dade State Attorney Office.
Q. And you were here during the incident that’s been described by the witnesses?
A. Yes.
Q. Where were you seated?
A. I was seated probably twenty-five feet away from here right now at the table for the prosecutor.
Q. Mr. Michaels was questioning Mr. Hope, correct?
A. Correct.
*342 Q. In the middle of a question, there was an interruption at one point?
A. There was an objection.
Q. Who made the objection?
A. Mr. Vonzamft.
Q. What did Mr. Michaels do?
A. Mr. Michaels turned toward Mr. Vonzamft, raised his voice and told him not to interrupt. I can’t remember specifically what was said, but the records should state exactly what Mr. Michaels said at that point.
Q. Did he make any type of gesture?
A. Gesture with his hands.
Q. Yes.
A. Yes.
Q. What was that?
A. He extended his arm out. I couldn’t see his actual fingers, but he extended his arm toward Mr. Vonzamft.
Q. What did Mr. Vonzamft do at that point?
A. Mr. Vonzamft stood up from his chair and approached the State podium.
Q. Was he saying anything or doing anything?
A. He was addressing the Court.
Q. What was he saying?
A. He was objecting based off of Mr. Michaels questioning to Mr. Hope.
Q. Was he saying anything else about what should be done with Mr. Michaels?
A. He pointed at Mr. Michaels and asked the Court to have him held in contempt or baker acted.
Q. At anytime did Mr. Vonzamft make a fist?
A. No.
Q. Did you at any point get up and approach Mr. Vonzamft?
A. Yes.
Q. How did you approach him?
A. I got up from the chair that I was sitting in and approached the State’s podium.
Q. Was that to his right or left?
A. I was standing to Mr. Vonzamft’s left.
Q. So you were in between Mr. Von-zamft and Mr. Michaels?
A. Correct.
Q. Did you do anything as far as attempting to restrain Mr. Vonzamft?
A. I wouldn’t say it like that. I put my left hand on Mr. Vonzamft’s left shoulder in order to keep him calm.
Q. Why did he need to be kept calm?
A. He was calm. I just didn’t believe that things need to get out of control and I don’t believe they were out of control on that point by Mr. Vonzamft.
Q. What was Mr. Michaels doing when that was going on?
A. My back was toward Mr. Michaels.
Q. Did you hear him yelling, screaming, ranting and raving?
A. I don’t know about yelling and screaming, but he was raising his voice. I couldn’t tell you actual words he was saying at that point.
Q. Did you recall him saying any expletive, profanity, cursing?
A. He did later.
Q. At that point did you hear anything?
A. Correct, I couldn’t tell you.
8. Mr. Von Zamft
Q. Mr. Michaels was asking a question of Mr. Hope, correct?
A. Yes.
Q. And you tried to interpose an objection?
A. I did interpose an objection. That’s what an objection does.
Q. He extended his hand, right?
*343 A. Absolutely.
Q. He remained here at the podium?
A. He did.
[[Image here]]
Q. Did you at anytime make a fist?
A. Yes.
Q. And what were you doing while you were making the fist?
A. Approaching the podium.
Q. That’s also bringing you closer from counsel table to where Mr. Michaels is?
A. No, its bringing me to the State’s podium.
Q. State’s podium isn’t closer to Mr. Michaels and counsel table?
A. Of course it is, but that’s where I go to speak to the Court.
Q. Did you hear Mr. Michaels utter any kind of profanity or expletive?
A. Mr. Michaels was mouthing whatever he was mouthing. I could not read his mouth from where I was.
Q. You have no idea what it was he was mouthing?
A. No, I do not know what he was mouthing.
Q. He could have been saying the lord’s prayer?
A. You wouldn’t want me to speculate on what he was mouthing.
Q. Was there a point when Mr. Michell came and got between you and Mr. Mi-chaels?
A. Yes.
Q. What did Mr. Mitchell do at that time?
A. Said relax.
Q. Did he put his hand on you or make any gesture to you?
A. Put his hand on my shoulder and said relax.
Q. All right. You were here during the read back, correct?
A. Yes.
Q. And after the objection and I guess I wasn’t here, but I guess after you sat back down, Mr. Michaels asked the Court can I finish, right?
A. If that’s what the read back says.
Q. And the judge said go ahead?
A. Then I made another objection.
Q. You continued with the objection?
A. No, I made another objection.
Q. Mr. Michaels hadn’t insulted or done anything to you at that point, right?
A. He was continuing his actions. I made another objection. When I made that objection is when he put his hand out?
Q. He was trying to ask a question of the witness?
A. And I made an objection.
Q. And?
A. Which is when he put his hand out.
Q. Right. When he puts his hand out, he remained here at defense podium.
A. Yes, and I went to State’s podium.
Q. He didn’t say anything threatening to you, correct?
A. If he did, I did not hear it.

. The testimony of the seven (7) witnesses not involved in the altercation is attached in an appendix to this dissent, as well as the pertinent testimony of Von Zamft.

. Specifically, Michaels testified:
Q: Other than extending your hand and telling him to let you finish the question that you asked before he objected, did you make any verbal threats?
A: No, I never threaten anyone. No verbal threats. However, I mumble few words in my native language.
Q: What is your native language?
A: Romanian.
Q: When you say you mumbled them?
A: There is no sound coming out of my mouth. I don't think anyone could possibly know what I said no matter who they are.
Q: When you get frustrated do you revert to your native language?
A: I do.... I learn over the years, not in court to use the English word f* *k you. That's what I’m accused apparently by this Court or mimicking with my lips.... I didn't say them. I didn't voice them. I just mimic them with my mouth. If that's contempt, I guess it should be intent. My intention was not offend anybody, not to be contemptuous. That was my last question and I was hoping to go home. Be finish and be done with it.
[[Image here]]
Q: To your knowledge does Judge Miranda, Mr. Hope or anyone else who was in this courtroom at the time speak or understood [sic] Romanian?
A: There is [sic] a lot of people in this courtroom, none of them speak Romanian.
Q: When you revert to Romanian that's so you will not be offensive?
A. Exactly.

. Specifically, the following exchange occurred:
THE COURT: Unfortunately for you I saw it and I understood it. It’s very unprofessional. At the point we address it I’ll address all of it on the record. The gap that was referred to in the testimony, just so that is clear was a gap in text messages, not a gap in communication. So your objection as to beyond the scope is sustained.
MR. MICHAELS: It’s redirect.
THE COURT: It’s redirect bust [sic] it's not redirect as to the initial threat. It has to be something that was spoken about on cross.

. Saunders v. State, 319 So.2d 118 (Fla. 1st DCA 1975).