# Supreme Court of Florida

_____

No. SC14-414
_____

**NOEL PLANK,**
Petitioner,

vs.

**STATE OF FLORIDA,**
Respondent.

[March 17, 2016]

PER CURIAM.

The certified conflict issue in this case is whether an individual is entitled to counsel in direct criminal contempt proceedings before incarceration is imposed as punishment. The First District Court of Appeal rejected that argument in Plank v. State, 130 So. 3d 289, 290 (Fla. 1st DCA 2014), but certified that its decision is in direct conflict with the decisions of the Second District Court of Appeal in Al-Hakim v. State, 53 So. 3d 1171, 1174 (Fla. 2d DCA 2011), and Woods v. State, 987 So. 3d 669, 674 (Fla. 2d DCA 2007), and the Fourth District Court of Appeal in Hayes v. State, 592 So. 2d 327, 329 (Fla. 4th DCA 1992), which all held that a

defendant has a right to counsel in direct criminal contempt proceedings before incarceration is imposed as punishment.[1]

We resolve the conflict, holding in accordance with the First District that a trial court has the discretion, but is not required, to appoint counsel or give the individual an opportunity to seek counsel in a direct criminal contempt proceeding, even if incarceration is imposed as punishment, as long as the period of incarceration does not exceed six months. Nevertheless, because the allegedly contemptuous conduct for which Petitioner Noel Plank was incarcerated in this case did not involve conduct that occurred only in the presence of the court, the trial court erred in classifying the conduct as direct criminal contempt. Plank was therefore entitled to the benefit of counsel and to the procedures set forth in the Florida Rule of Criminal Procedure 3.840 governing indirect criminal contempt. Accordingly, while we approve the reasoning of the First District that there is no requirement to appoint counsel in direct criminal contempt proceedings where a defendant is incarcerated for less than six months, we quash the First District's decision upholding the conviction and direct that Plank's conviction for direct criminal contempt be vacated.

---

1. We have jurisdiction. <u>See</u> art. V, § 3(b)(4), Fla. Const.

# FACTS

On April 15, 2013, Noel Plank, a prospective juror, appeared for jury duty at the Leon County Courthouse at 11:30 a.m. and was part of a panel that was seated in the courtroom at approximately 1:40 p.m. In response to general biographical questioning, Plank advised the trial judge that he had various issues that would make it difficult for him to serve on the jury:

> I work a full day. I work 13 hours on Thursdays, and I have no time or money to sit in court waiting for all of y'all. First of all, I'm going to tell you straight out. I'm antiwar, Vietnam draft card burner, and avoided the Vietnam war. I'm also 4F.

When the judge inquired about the meaning of "4F," Plank responded:

> Unqualified for military. Another thing is I'm antigovernment. I have not voted since Ronald Reagan was president. I'm not even registered to vote. And I'm also, to tell you the truth, I'm a drunk.

The trial judge did not excuse Plank based on those reasons, and jury selection continued. In response to later general questions pertaining to his background, Plank responded as follows:

> My name is Noel Plank. I'm a driver. I deliver Homes & Land, Tallahassee Woman. You've seen them on magazine racks all over Tallahassee. I have no spouse. I'm divorced. I do have a daughter, but she lives with my ex. She's a writer at FSU. I've lived here for 23 years . . . .
> And as far as victim of crime, yes, I have been a victim of several crimes, identity theft, theft of over a thousand dollars' worth of professional camera equipment, theft of cell phone, and I've been burglarized a couple of times, nothing serious taken except a six-pack of beer, which I was kind of teed off at, because I was looking forward to having a beer after work, when I got home after work.

And the police officer says—the sheriff's asking me, "Did you check the fridge?" I said, "I never thought of that." And sure enough, they took, they took my six-pack of beer. Okay. I found that out.

And I can listen but my mind goes from about here to here (indicating) and I'll forget. You can tell me your name. I will forget it as soon as I walk ten feet. I, I have a bad memory, okay, because I also have a plastic plate in this side of my head. That's why I'm 4F from the military. I've had a bad car accident when I was 17, and things have happened and I'm getting older and I'm starting to lose my memory. Okay? And—okay. I know no other jurors in here. I've never served on a jury before.

At some point during jury selection, Plank apparently fell asleep. The other jurors complained that Plank smelled of alcohol and was difficult to awaken at a break in jury selection at about 2:55 p.m. as the other jurors tried to pass by Plank. At the trial judge's direction, a Leon County Probation Officer, Ceressa Haney, then administered a breathalyzer test to Plank around 3 p.m., which was performed outside the presence of the trial judge.

An hour later, at approximately 4 p.m., the trial judge held a contempt hearing regarding Plank's conduct during jury selection. At the hearing, Officer Haney testified that the results from the breathalyzer test demonstrated Plank had a blood-alcohol level of 0.111, and that it is illegal to drive with a blood-alcohol level over 0.08. In addition, Officer Haney testified that she smelled alcohol on Plank's "general person" but could not determine if the smell came from his clothes or his breath. When Plank was given the opportunity to question Officer

- 4 -

Haney, he asked only: "What I'd like to know is how I got the smell of beer on my clothes when I never spilt one drop on my clothing."

At that point, the trial judge asked Plank to come to the microphone. Plank, who apparently was handcuffed by that time, replied that he was having a hard time getting out of the chair himself, especially with "bracelets." The trial judge then informed Plank that although he arrived for jury duty at 11:30 a.m., his blood alcohol content was still 0.111 more than three hours later, indicating that his blood-alcohol level was even higher when he first arrived at the courthouse. In addition, the trial judge stated that she believed that Plank may have driven to the courthouse, and Plank confirmed that he had. The trial judge provided Plank with the opportunity to explain why he should not be held in contempt, to which Plank stated:

> First of all, I was extremely tired. I was up at 1:00 this morning, and I start work at 5:00 in the morning. I had to walk in and out, in and out, in and out of the vehicle every other door, like, from here to your back door there, that distance, and it's very tiring.

In response to the trial judge asking if there was anything else he wanted to tell her, Plank stated:

> Other than I can't afford to be—if you got me coming in here to court and all this, that's what I tried telling you before. I don't get paid for coming to court. Okay? I don't get paid for taking time off. Also, I'm about—in the process of losing my house, which I own here in Leon County for, let's see, 13 years. My mortgage company has been giving me a chance to catch up because I missed one month. And my hours have been dropped. I used to make 400 a week. Now

I'm making 200 a week. I'm barely making it. That's, that's why I want to get out of court duty, because Thursday is my busiest day. But if you insist, I'll lose my house and everything. I'll be living out on the street with everybody else.

The trial judge stated that although she did not want Plank to lose his house, she wanted him to come to jury duty without being drunk. She then found Plank in direct criminal contempt:

> All right. I'm going to find that you're in direct criminal contempt for not only coming to the courthouse drunk but it was also—in doing that, you disrupted the jury selection here this afternoon and distracted other jurors. Other jurors obviously noticed that you smelled of alcohol, were drunk. So I am finding you in contempt.

Before imposing the sentence, the trial judge provided Plank an opportunity to offer any mitigating circumstances, to which Plank responded that he did not know what else to say. The trial judge then sentenced him to thirty days in the Leon County Jail, explaining the sentence as follows:

> I can't ignore this behavior that, that you're here, you're over the legal limit, you're acting disruptive during jury selection. You tell me that you're a drunk and that you've refused to follow the law. I mean, that's what you said during the jury selection. And then it turns out that your blood alcohol level is significantly over the legal limit after you've been here for three and a half hours. So certainly your blood alcohol level has come down during that past three and a half hours. And you drove here.
> So, I mean, the driving itself, of course, wasn't in my presence and wasn't part of direct criminal contempt, but I certainly think it's a legitimate factor for me to consider, and I think 30 days is reasonable. So that's my ruling and I'm required to do a written order, so I'll do that, as well.

The trial judge subsequently entered a written order finding Plank guilty of direct criminal contempt for arriving to the courthouse drunk, disrupting jury selection, and distracting the other jurors. In support of this conviction, the order relied on the following actions: when Plank was asked to provide background information, he responded that he should not have to serve on a jury because he was "able to evade the military draft," worked thirteen-hour days, had a "4F" military designation, and was a drunk; he slept during some of the jury selection and was difficult to awaken; other jurors indicated that Plank smelled of alcohol; and the results of Plank's breathalyzer test indicated that he had 0.111 grams of alcohol per 210 liters of breath. The trial judge found Officer Haney's testimony to be "credible."

The order set forth that Plank's actions were "directed against the authority and dignity of the Court" and "interfered with the judicial function." The order stated that the actions tended to "embarrass, hinder or obstruct the Court in the administration of justice and to lessen the Court's dignity."

The trial judge further noted in the order the "mitigating" circumstances of Plank having worked late delivering magazines and having "only" a couple of beers in the morning. As to Plank's testimony of his financial difficulties, the order set forth:

> [H]e could have come to the Court without drinking and . . . he drove
> to the Courthouse after drinking and . . . any mitigation presented by

[Plank] is lessened by the fact that [his] breath alcohol would have been significantly higher when he drove to the Courthouse at approximately 11:30 a.m.

The trial judge sentenced Plank to thirty days in the Leon County Jail and advised Plank he had thirty days to file a notice of appeal. Seventeen days later, the trial judge mitigated Plank's sentence to time served and ordered that he be released immediately.

Plank was declared indigent for purposes of appeal and, through the Public Defender's Office, appealed his conviction and sentence for the contempt of court. The First District initially affirmed without a written opinion. Plank filed a motion for rehearing and requested a written opinion and certification of the conflict, which the district court granted. The First District then issued an opinion, which stated:

> Appellant argues that the trial court erred by not appointing him counsel or giving him an opportunity to seek counsel for the contempt proceeding. We affirm on the authority of Williams v. State, 698 So. 2d 1350 (Fla. 1st DCA 1997), and Saunders v. State, 319 So. 2d 118 (Fla. 1st DCA 1975), in which this court held that a defendant does not have a right to counsel under the Sixth Amendment or the Florida Rules of Criminal Procedure when charged with direct criminal contempt. Accord Searcy v. State, 971 So. 2d 1008, 1014 (Fla. 3d DCA 2008); Forbes v. State, 933 So. 2d 706, 711 (Fla. 4th DCA 2006); see also In re Oliver, 333 U.S. 257, 274-75 (1948) (explaining that the right to counsel and other due process requirements are not implicated in contempt cases involving "charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent demoralization of

the court's authority before the public" (internal quotations and ellipses omitted)); In re Terry, 128 U.S. 289, 313 (1888) (explaining that a court's jurisdiction to punish direct contempt vests upon commission of the contemptuous act and that it is within the court's discretion to punish the offense immediately or to postpone action until the defendant is afforded an opportunity to present a defense).

We recognize that the Second District held in Woods v. State, 987 So. 2d 669 (Fla. 2d DCA 2007), and Al-Hakim v. State, 53 So. 3d 1171 (Fla. 2d DCA 2011), that a defendant has a right to counsel under the Florida Rules of Criminal Procedure in direct criminal contempt proceedings. The Fourth District reached a similar conclusion in Hayes v. State, 592 So. 2d 327 (Fla. 4th DCA 1992). But see Forbes, supra. Accordingly, we certify conflict with these cases.

Plank, 130 So. 3d at 290. This Court granted review based on the certification of interdistrict conflict.

## ANALYSIS

The district courts of appeal are split regarding whether an individual is entitled to counsel in direct criminal contempt proceedings before incarceration is imposed as punishment. In order to fully analyze this issue, we first examine the right to counsel provided by the Sixth Amendment of the United States Constitution and how the United States Supreme Court has interpreted that right to counsel in direct criminal contempt proceedings. We then review the right to counsel under the Florida Constitution and our procedural rules and precedent. We ultimately resolve the conflict by determining that a trial court is not required to appoint counsel or give the individual an opportunity to seek counsel in a direct criminal contempt proceeding, even if incarceration is imposed as punishment, as

- 9 -

long as the period of incarceration does not exceed six months—the point at which the defendant's Sixth Amendment rights are triggered. Finally, we conclude that the trial court erred in treating Plank's conduct in this case as direct criminal contempt, rather than indirect criminal contempt. Accordingly, notwithstanding our holding on the conflict issue, the trial court should have followed the procedural rules already in existence pertaining to indirect criminal contempt, which include entitlement to counsel.

## I. Right to Counsel in Direct Criminal Contempt Proceedings

Plank asserts that the trial court committed fundamental error in failing to provide him with appointed counsel or an opportunity to seek counsel before convicting him of direct criminal contempt and sentencing him to incarceration. In support, he relies on the Sixth Amendment right to counsel; the analogous right to counsel under article I, section 16, of the Florida Constitution; the state and federal due process clauses; section 27.51 of the Florida Statutes; and the Florida Rules of Criminal Procedure. But none of these alleged constitutional, statutory, or procedural bases provides for the right to counsel in direct criminal contempt proceedings.

First, such a requirement for counsel in direct criminal contempt cases does not exist within either the federal or state constitutions. The Sixth Amendment to the United States Constitution provides generally that "[i]n all criminal

prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." Amend. VI, U.S. Const.; see also Argersinger v. Hamlin, 407 U.S. 25, 37 (1972) (holding that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel").

In Florida, article I, section 16, of our state constitution specifically guarantees the right to counsel, stating, "In all criminal prosecutions the accused . . . shall have the right to have compulsory process for witnesses, to confront at trial adverse witnesses, to be heard in person, by counsel or both, and to have a speedy and public trial by impartial jury in the county where the crime was committed." Art. I, § 16, Fla. Const. As this Court has previously recognized, based on the express language of this constitutional provision, its formative history, preexisting and developing state law, and the state's own general history, Florida provides an even broader right to counsel than is provided by the Sixth Amendment. State v. Kelly, 999 So. 2d 1029, 1041 (Fla. 2008).

Despite the constitutional guarantee to the right to counsel, however, courts of this nation have long had the inherent authority to impose immediate penalties in direct criminal contempt proceedings, where the misconduct occurred within the court's direct view and interfered with the court's ability to discharge its essential functions. In In re Terry, 128 U.S. 289 (1888), the United States Supreme Court first recognized a judge's inherent authority to immediately punish a contemnor by fine or imprisonment—without notice or a special hearing. Specifically, in Terry, the Supreme Court denied the claim that the contemnor was unlawfully imprisoned after being found in direct criminal contempt of court for assaulting a marshal and interrupting an ongoing trial, even though the contemnor was not provided with all of the constitutional protections generally afforded to an accused. Id. at 305-06. The Supreme Court explained that this departure from the accepted standards of due process was permissible because the direct criminal contempt power is essential to protect the courts in the discharge of their functions. Id. at 313. The Supreme Court emphasized that the power was restricted to suppressing and punishing court-disrupting misconduct that occurred within the presence of the court. See id.

In Oliver, 333 U.S. at 275-76, the Supreme Court further recognized that while an individual charged with contempt of court generally must be advised of the charges against him or her, have a reasonable opportunity to be heard, have the

right to be represented by counsel, and have a chance to call witnesses, such requirements did not apply to direct criminal contempt. In order to qualify as direct criminal contempt, however, the Supreme Court clarified that the misconduct must have occurred "in open court, in the presence of the judge, [and] disturb[] the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority . . . before the public.' " Id. at 275. "If some essential elements of the offense are not personally observed by the judge, so that [the judge] must depend upon statements made by others for his knowledge about these essential elements," the Supreme Court held that "due process requires . . . that the accused be accorded notice and a fair hearing." Id. at 275-76.

The Supreme Court decided these direct criminal contempt cases prior to Gideon v. Wainwright, 372 U.S. 335 (1963), which held that the Sixth Amendment's right to assistance of counsel in criminal proceedings is made obligatory on the states by the Fourteenth Amendment. While the Supreme Court has not spoken directly on Gideon's impact on the right to counsel in direct criminal contempt proceedings, it has not overruled its prior holdings in Terry or Oliver.

- 13 -

Plank, nevertheless, points to Bloom v. Illinois, 391 U.S. 194, 201-02 (1968), for support that the United States Supreme Court has applied other protections guaranteed by the Sixth Amendment to direct criminal contempt. In Bloom, the Supreme Court declared that in direct criminal contempt proceedings, a defendant has a Sixth Amendment right to a trial by jury when a judge is considering a sentence of imprisonment in excess of six months. Id. at 199; see also Codispoti v. Pennsylvania, 418 U.S. 506, 515-16 (1974).

We reject Plank's argument that Bloom requires courts to appoint counsel in all direct criminal contempt proceedings. Instead, we conclude that Bloom impacts only cases in which incarceration is imposed for longer than six months.

After a review of the relevant precedent, we hold that Plank does not have a Sixth Amendment right to counsel prior to being incarcerated for direct criminal contempt, as long as the period of incarceration does not exceed six months—the point at which his Sixth Amendment right to counsel is triggered. Simply put, nothing within the Supreme Court's current jurisprudence requires the result that Plank seeks.

Likewise, in Florida, we have long recognized that courts have the inherent authority to take immediate action when the contemnor commits an act of direct criminal contempt in the judge's presence that disturbs the court's business and prevents it from carrying out the court's essential functions. This Court has

previously explained the public policy reasons behind a court's inherent authority for acting immediately on direct criminal contempt: "The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter." Parisi v. Broward Cty., 769 So. 2d 359, 363 (Fla. 2000) (quoting United States v. United Mine Workers, 330 U.S. 258, 303 (1947)).

It is important that courts have the power necessary to require "silence, respect, and decorum, in their presence," but this need must be balanced with the recognition that the contempt power "uniquely is 'liable to abuse' " because "the offended judge [is] solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." Id. (quoting Int'l Union, United Mine Workers v. Bagwell, 512 U.S. 821, 831 (1994)). As a result, this Court has emphasized that "a balance must be struck between the recognition that courts are vested with contempt powers to vindicate their authority and the necessity of preventing abuse of these broad contempt powers." Id.

Florida statutory provisions similarly recognize the courts' authority to act on contempt of court. Specifically, section 38.22, Florida Statutes (2013), provides: "Every court may punish contempts against it whether such contempts be direct, indirect, or constructive, and in any such proceeding the court shall proceed to hear and determine all questions of law and fact."

Plank, however, relies on section 27.51, Florida Statutes (2013), for the proposition that he must be afforded counsel when charged with direct criminal contempt. Section 27.51(1) provides that a public defender "shall" represent an indigent, and specifically provides that this provision applies to those who are charged with criminal contempt.

We reject Plank's contention. Nothing within this statute requires that the trial court appoint counsel before acting immediately on direct criminal contempt that just occurred within the court's presence and that requires immediate punishment to prevent the demoralization of the court's authority before the public. Again, direct criminal contempt is a narrow exception to the procedural safeguards generally required, permitting a court to take immediate action to punish contemnors in order to ensure the court's authority is vindicated and the court can conduct its necessary functions.

Plank's last contention is that he was entitled to the appointment of counsel based on Florida Rule of Criminal Procedure 3.111(b)—a position also taken by the Second District in Woods and Al-Hakim. Rule 3.111(b) requires the appointment of counsel for indigent persons "in all prosecutions for offenses punishable by incarceration." However, this general rule does not trump the specific rule governing direct criminal contempt, Florida Rule of Criminal

Procedure 3.830, which specifically addresses the procedures that govern direct criminal contempt proceedings. Rule 3.830 states in full:

> A criminal contempt may be punished summarily if the court saw or heard the conduct constituting the contempt committed in the actual presence of the court. The judgment of guilt of contempt shall include a recital of those facts on which the adjudication of guilt is based. Prior to the adjudication of guilt the judge shall inform the defendant of the accusation against the defendant and inquire as to whether the defendant has any cause to show why he or she should not be adjudged guilty of contempt by the court and sentenced therefor. The defendant shall be given the opportunity to present evidence of excusing or mitigating circumstances. The judgment shall be signed by the judge and entered of record. Sentence shall be pronounced in open court.

Fla. R. Crim. P. 3.830.

In contrast, Florida Rule of Criminal Procedure 3.840 governs indirect criminal contempt, which involves conduct committed outside the presence of the court. Subsection (d) of rule 3.840 explicitly provides that a defendant is entitled to be represented by counsel at the contempt hearing. In full, rule 3.840 states:

> A criminal contempt, except as provided in rule 3.830 concerning direct contempts, shall be prosecuted in the following manner:
> (a) Order to Show Cause. The judge, on the judge's own motion or on affidavit of any person having knowledge of the facts, may issue and sign an order directed to the defendant, stating the essential facts constituting the criminal contempt charged and requiring the defendant to appear before the court to show cause why the defendant should not be held in contempt of court. The order shall specify the time and place of the hearing, with a reasonable time allowed for preparation of the defense after service of the order on the defendant.

(b)  Motions; Answer.  The defendant, personally or by counsel, may move to dismiss the order to show cause, move for a statement of particulars, or answer the order by way of explanation or defense.  All motions and the answer shall be in writing unless specified otherwise by the judge.  A defendant's omission to file motions or answer shall not be deemed as an admission of guilt of the contempt charged.

(c)  Order of Arrest; Bail.  The judge may issue an order of arrest of the defendant if the judge has reason to believe the defendant will not appear in response to the order to show cause.  The defendant shall be admitted to bail in the manner provided by law in criminal cases.

(d)  Arraignment; Hearing.  The defendant may be arraigned at the time of the hearing, or prior thereto at the defendant's request.  A hearing to determine the guilt or innocence of the defendant shall follow a plea of not guilty.  The judge may conduct a hearing without assistance of counsel or may be assisted by the prosecuting attorney or by an attorney appointed for that purpose.  _The defendant is entitled to be represented by counsel, have compulsory process for the attendance of witnesses, and testify in his or her own defense.  All issues of law and fact shall be heard and determined by the judge_.

(e)  Disqualification of Judge.  If the contempt charged involves disrespect to or criticism of a judge, the judge shall disqualify himself or herself from presiding at the hearing.  Another judge shall be designated by the chief justice of the supreme court.

(f)  Verdict; Judgment.  At the conclusion of the hearing the judge shall sign and enter of record a judgment of guilty or not guilty.  There should be included in a judgment of guilty a recital of the facts constituting the contempt of which the defendant has been found and adjudicated guilty.

(g)  Sentence; Indirect Contempt.  Prior to the pronouncement of sentence, the judge shall inform the defendant of the accusation and judgment against the defendant and inquire as to whether the defendant has any cause to show why sentence should not be pronounced.  The defendant shall be afforded the opportunity to present evidence of mitigating circumstances.  The sentence shall be pronounced in open court and in the presence of the defendant.

Fla. R. Crim. P. 3.840 (emphasis added).

Under our precedent, a specific rule trumps a general rule. See State v. Bivona, 496 So. 2d 130, 133 (Fla. 1986) ("[T]he specific provision of (b)(1) supersedes any general provision of the remainder of the rule."); M.W. v. Davis, 756 So. 2d 90, 106 n.31 (Fla. 2000) ("[A] specific statute governing a particular subject takes precedence over a conflicting more general statute."). Thus, applying that principle here, the specific rule governing direct criminal contempt trumps a general rule pertaining to the right to counsel. In addition, the specific procedures outlined in the rule governing indirect criminal contempt, which includes entitlement to counsel, contrasts with the absence of a specific provision establishing the entitlement to counsel in the direct criminal contempt rule.

Where a court's ability to undertake its essential functions is jeopardized, the court must be able to act swiftly to ensure it can fulfill its obligations and preserve the dignity of court proceedings. Imposing a mandatory requirement that counsel be appointed or that the contemnor have the opportunity to obtain counsel could interfere with the court's ability to act swiftly to vindicate its authority. As the Eleventh Circuit Court of Appeals has stated, the "power to summarily hold an individual in direct criminal contempt operates to vindicate the authority of the court and stands as a bulwark against disorder and disruption in the courtroom." United States v. Baldwin, 770 F.2d 1550, 1553 (11th Cir. 1985) (quoting Sandstrom v. Butterworth, 738 F.2d 1200, 1208-09 (11th Cir. 1984)).

That said, the very absence of the usual constitutional protections for an individual charged with direct criminal contempt and the extraordinary power to summarily punish an individual found in direct criminal contempt to incarceration for a period of up to six months without an attorney highlights what has been emphasized in our jurisprudence. Namely, courts must exercise restraint in using this power, especially where incarceration is being considered or imposed. The purpose of permitting a court to act immediately in cases of direct criminal contempt is that the misconduct of an individual in front of the court could interfere with the court's inherent authority to carry out its essential responsibilities. As we have previously emphasized, "although the power of contempt is an extremely important power for the judiciary, it is also a very awesome power and is one that should never be abused." In re Inquiry Concerning Perry, 641 So. 2d 366, 368 (Fla. 1994). We have also highlighted the importance of protecting due process rights, particularly where incarceration was at issue: "because trial judges exercise their power of criminal contempt to punish, it is extremely important that they protect an offender's due process rights, particularly when the punishment results in the imprisonment of the offender." Id.

Further, we embrace the Fourth District Court of Appeal's apt explanation in Schenck v. State, 645 So. 2d 71, 74 (Fla. 4th DCA 1994), that the "unique power" exercised in direct criminal contempt proceedings "must be used only rarely and

with circumspection." As the Fourth District stated, "the provocation must never be slight, doubtful, or of shifting interpretations. The occasion should be real and necessary, not murky, and not ameliorated in some less formal manner." Id. The Fourth District explained in another case how the power to punish direct criminal contempt is one of the most unusual powers of a court: "the judge who was the object . . . of the allegedly contemptuous conduct becomes the prosecutor and then sits in judgment over the very defendant who is said to have just assailed the judicial dignity. That precise circumstance is condoned nowhere else in the law. For that reason, the power must be cautiously and sparingly used." Emanuel v. State, 601 So. 2d 1273, 1274 (Fla. 4th DCA 1992) (quoting Fabian v. State, 585 So. 2d 1158 (Fla. 4th DCA 1991) (Farmer J., dissenting)).

While we agree that the power must be cautiously and sparingly used, nevertheless, when required, we will not mandate that the judge interrupt the direct criminal contempt proceeding to either appoint an attorney or allow the contemnor to consult with one where the period of incarceration is less than six months. As even the State agrees, however, the trial judge certainly has the discretion to do so, particularly if considering incarceration as punishment.

## II. Direct Versus Indirect Criminal Contempt

Although the First District was correct that Plank was not entitled to counsel in a direct criminal contempt proceeding, we conclude that the trial court

- 21 -

nonetheless erred in failing to appoint counsel for Plank because the conduct at issue did not involve direct criminal contempt. Contempt of court can assume a variety of forms: either civil or criminal in nature, as well as direct or indirect. See Demetree v. State ex rel. Marsh, 89 So. 2d 498, 501 (Fla. 1956). As this Court has long recognized, the rights to which a contemnor is entitled, the quantum of proof necessary to convict, and the nature of the punishment that may be administered upon a determination of guilt are all dependent on the type of contempt at issue. Id. Thus, courts must first identify the nature of the proceeding "because of the drastic nature of punishment oftentimes administered and because of the potentials for impinging upon the fundamental rights of a party by the exercise of the power." Id.

Criminal contempt is considered to be "a crime in the ordinary sense." Parisi, 769 So. 2d at 364. A criminal contempt proceeding is "instituted solely and simply to vindicate the authority of the court [or] otherwise punish for conduct offensive to the public in violation of an order of the court." Demetree, 89 So. 2d at 502. When imprisonment is ordered, the term is for a set amount of time and is administered as punishment for an act that was committed. Id.

Criminal contempt proceedings are either direct or indirect. See, e.g., State v. Diaz de la Portilla, 40 Fla. L. Weekly S626 (Fla. 2015). Conduct committed outside the presence of the court is indirect criminal contempt. Pugliese v.

Pugliese, 347 So. 2d 422, 425 (Fla. 1977) ("Where an act is committed out of the presence of the court, the proceeding to punish is for indirect (sometimes called constructive) contempt.").

In order to be considered direct criminal contempt, all of the acts underlying the contemptuous conduct must be committed in open court in the presence of the judge, "where all of the essential elements of the misconduct are under the eye of the court [and] are actually observed by the court." Oliver, 333 U.S. at 275. If the judge needs to rely on statements and testimony from others regarding their knowledge about the contemptuous acts, the misconduct is no longer considered direct criminal contempt because additional testimony or explanation is necessary. Id. at 275-76. As the Supreme Court has stressed, "the judge must have personal knowledge of [the misconduct] acquired by his own observation of the contemptuous conduct." Id. at 275. "[K]nowledge acquired from the testimony of others, or even from the confession of the accused, would not justify conviction without a trial in which there was an opportunity for defense." Id.

The procedural safeguards to which a defendant is entitled vary based on whether he or she is charged with direct or indirect criminal contempt. Rule 3.830, governing direct criminal contempt, requires fewer procedural safeguards and permits a trial court to summarily punish the contemnor's misconduct so long as the misconduct was committed in the actual presence of the court, whereas the

- 23 -

more extensive procedures provided in rule 3.840, governing indirect criminal contempt, entitle the contemnor to be represented by counsel.

## III. This Case

Applying these principles to the facts presented here, it becomes clear that this is not a case of direct criminal contempt. In determining whether Plank committed criminal contempt, the trial judge took testimony from a probation officer regarding Plank's blood-alcohol level after the officer administered a breathalyzer test. In addition, the trial judge relied on off-the-record statements from the jurors that Plank smelled of alcohol and Plank's own admissions that he drank before attending jury duty and that he drove to the courthouse.

While the trial judge may have seen that Plank was asleep or that he had to be awakened by the other jurors, the order supporting the contempt conviction fails to specify which acts the trial judge personally observed or whether this information was presented to the judge from other jurors, who attempted to wake Plank during a break so they could pass by his seat. If the only act personally observed by the trial judge was a prospective juror who fell asleep during voir dire, this is not the type of willful misconduct that would typically require a court to use its "unique power." Schenck, 645 So. 2d at 74 (emphasizing that the provocation to justify direct criminal contempt "must never be slight, doubtful, or of shifting interpretations," but must be an occasion where the need to act is "real and

necessary . . . and not ameliorated in some less formal manner"); Emanuel, 601 So. 2d at 1274 (stating that the power to exercise direct criminal contempt "must be cautiously and sparingly used"). Whenever a judge must take testimony during a criminal contempt proceeding or rely on additional evidence not directly observed by the trial judge, the proceeding is no longer direct criminal contempt but becomes indirect criminal contempt. See Oliver, 333 U.S. at 276 (explaining that in order to qualify as direct criminal contempt and thus satisfy the "narrow exception" to general due process requirements, the misconduct must have occurred "in open court, in the presence of the judge . . . where all of the essential elements of the misconduct are under the eye of the court").

Because this case involved indirect criminal contempt, the trial court erred in failing to either appoint counsel or permit Plank the opportunity to obtain counsel. Florida Rule of Criminal Procedure 3.840, governing indirect criminal contempt, requires that the court issue an order to show cause with reasonable time allowed for preparation of the defense and further provides that the defendant is "entitled to be represented by counsel, have compulsory process for the attendance of witnesses, and testify in his or her own defense." Fla. R. Crim. P. 3.840(d). These necessary procedures for indirect criminal contempt proceedings were not followed in this case.

**CONCLUSION**

We resolve the conflict regarding whether a defendant has the right to the appointment of counsel in direct criminal contempt proceedings before incarceration is imposed as punishment and hold that a trial court is not required to appoint counsel or give the individual an opportunity to seek counsel in a direct criminal contempt proceeding, even if incarceration is imposed as punishment, as long as the period of incarceration does not exceed six months. Accordingly, we approve the holding of the First District that a trial court does not err by failing to provide a contemnor with the opportunity to seek counsel prior to imposing incarceration as a punishment in direct criminal contempt proceedings. We disapprove the holdings in Al-Hakim, Woods, and Hayes to the extent that they mandate, rather than simply permit, a trial court to either appoint counsel or provide a contemnor with the opportunity to seek counsel prior to imposing incarceration as a punishment for direct criminal contempt.

Nevertheless, while we approve the holding of the First District on the conflict issue, we quash the affirmance of Plank's direct criminal contempt conviction and direct that his conviction for direct criminal contempt be vacated because the conduct at issue involved indirect criminal contempt, rather than direct criminal contempt. We remand for proceedings consistent with this opinion.

It is so ordered.

- 26 -

LABARGA, C.J., and LEWIS, and POLSTON, JJ., concur.
PARIENTE, J., concurs in part and dissents in part with an opinion, in which
QUINCE and PERRY, JJ., concur.
CANADY, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND
IF FILED, DETERMINED.

PARIENTE, J., concurring in part and dissenting in part.

Noel Plank, an apparently intoxicated prospective juror, was sentenced to

thirty days' incarceration for direct criminal contempt while still intoxicated and

without the assistance of counsel to offer any mitigating evidence or to clearly

elicit from the trial court the basis for the allegedly contemptuous conduct. I agree

with the majority's decision to vacate Plank's contempt conviction because the

conduct relied on by the trial court was not direct criminal contempt, but I dissent

from the majority's holding that a defendant is not entitled to counsel in direct

criminal contempt proceedings when incarceration of six months or less is imposed

as punishment. While I share the majority's concerns that judges must be able to

immediately address contemptuous conduct that occurs in their presence and

disrupts judicial functions, those concerns can be effectuated in a way that still

preserves a defendant's right to be represented by an attorney prior to having his or

her liberty taken away for days, weeks, or even as long as six months.

Indeed, the Fourth District Court of Appeal has recognized this right to counsel in all direct criminal contempt proceedings since 1992, as has the Second District Court of Appeal since 2007. See Hayes v. State, 592 So. 2d 327 (Fla. 4th DCA 1992); Woods v. State, 987 So. 3d 669 (Fla. 2d DCA 2007). As these courts have concluded, requiring the appointment of counsel prior to the imposition of incarceration as punishment for direct criminal contempt does not prevent a trial judge from threatening to hold a disruptive individual in contempt, nor does it prevent the trial judge from removing a disruptive individual from the courtroom and taking the individual into custody, pending the contempt hearing. In fact, from the cases I have reviewed, the direct criminal contempt hearing rarely occurs at the same time as the disruptive conduct, even when no lawyer is appointed. I would not leave the right to counsel dependent on the discretion of the very trial judge, who has already determined that the individual has committed direct criminal contempt.

While this Court holds that the constitutional right to counsel does not apply to direct criminal contempt proceedings where incarceration is imposed as punishment, I urge the Rules Committee to propose for this Court's consideration a modification of the direct criminal contempt rule of procedure to require appointment of counsel if the trial judge imposes or is contemplating a jail

sentence in excess of twenty-four hours' incarceration.[2]  In this way, the contemnor

can be immediately taken into custody so that judicial functions are no longer

impacted, while being given notice of the misconduct underlying the direct

criminal contempt and the opportunity to consult with an attorney to present a

defense to the direct criminal contempt and to "present evidence of excusing or

mitigating circumstances."  This case is a telling example of how illusory the right

to present mitigating evidence is when the defendant is not represented by counsel.

The irony of the majority's decision is that the failure to require counsel to

be appointed for indigent defendants will most negatively impact citizens who are

in the courtroom on their own, unrepresented—and not the defendants cited by the

State as the most outrageous examples of direct criminal contempt, who are

already accused of crimes and are represented at trial by an attorney.  The inability

to consult with an attorney in direct criminal contempt proceedings thus disparately

affects those unrepresented individuals who have the least ability to conform with

courtroom expectations in the first place and who are most in need of

_____

2. In the recent case of In re Amendments to Florida Rule of Juvenile Procedure 8.150, 41 Fla. L. Weekly S37 (Fla. Feb. 11, 2016), this Court approved a new subdivision to Florida Rule of Juvenile Procedure 8.150, which expressly provides that juveniles in direct contempt cases have the right to legal counsel. Although I recognize that juveniles are different than adults in many ways, nevertheless, many unrepresented individuals may lack the knowledge to adequately defend against the pending direct criminal contempt charge without the assistance of counsel.

representation, including those with mental health conditions, alcohol or substance abuse problems, or limited knowledge of judicial proceedings.

I recognize the uniqueness of direct criminal contempt proceedings, which occur directly before the judge, who also serves as the accuser, the adjudicator, and the sentencer. But there are numerous reasons why the appointment of counsel is in the best interests of all parties involved, including the judge who must sentence the contemnor. In this case, for example, an attorney could have more clearly elicited, on the record, the basis for the allegedly contemptuous conduct, which would have assisted the appellate courts and, perhaps, given the trial judge more time to consider whether the conduct truly amounted to contempt of court. The appointment of counsel would also provide the trial court with a better understanding of relevant mitigation and permit an attorney to suggest other possible forms of punishment, thus fostering the court's ability to impose the most appropriate sentence. Further, counsel could ensure that the direct criminal contempt proceedings remain limited to the situation for which they were intended and assist the contemnor in comprehending the misconduct, understanding the ramifications of the behavior, and responding appropriately.

Allowing for the assistance of counsel will neither diminish any respect for the judge's authority, nor interfere with the judge's unique and awesome power to maintain order in the courtroom. To the contrary, I strongly believe that the

Constitution and the dignity of our judicial system are enhanced by allowing an individual to have the assistance of an attorney before a sanction of incarceration is imposed for direct criminal contempt.

Two grounds support this conclusion. First, the broad right to counsel provided under the United States Constitution, our Florida Constitution, and the applicable Florida statute requires the appointment of counsel for all offenses for which incarceration is imposed as punishment. Second, an individual's actual need for counsel where a sentence of incarceration is at issue remains especially strong, and the court's inherent authority to stop direct contemptuous misconduct is not undermined by requiring the court to appoint counsel in cases where the trial judge is considering a sentence of incarceration, particularly in light of the many tools and resources available to the trial judge to take immediate action to stop such misconduct. I address each of these grounds in detail below.

## I. Right to Counsel When Incarceration is Possible Punishment

Under the majority's holding, incarceration up to six months for direct criminal contempt of court is the only exception to the requirement of appointed counsel for indigent defendants. The majority's rule also precludes an unrepresented litigant who can afford counsel the opportunity to hire or consult with counsel.

Yet, the United States Supreme Court has long recognized that incarceration is such a different form of punishment that this loss of liberty creates the dividing line of when the Sixth Amendment right to counsel is triggered. Specifically, in Argersinger v. Hamlin, 407 U.S. 25, 37 (1972), the United States Supreme Court held that "absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, a misdemeanor, or a felony, unless he was represented by counsel at his trial." Id. (emphasis added). As the Supreme Court later explained in Scott v. Illinois, 440 U.S. 367, 373 (1979), "[W]e believe that the central premise of Argersinger—that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment—is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel."

The majority relies on In re Terry, 128 U.S. 289, 313 (1888), a nineteenth century case in which the United States Supreme Court held that the due process protections usually required before incarcerating an individual were not applicable in direct criminal contempt proceedings, because the direct criminal contempt power is essential to protecting the courts in the discharge of their functions. But, even in 1888, the United States Supreme Court recognized that the contempt authority is susceptible to abuse and restricted its use to suppressing court-disrupting misconduct that occurred directly in front of the court by the "disorderly

and violent." Id. In Terry, the contemnor—who himself was an attorney—had assaulted a marshal and interrupted a trial that was underway.

Although the United States Supreme Court has never overruled Terry, in the subsequent 128 years, the Supreme Court has placed stronger emphasis on the necessity of Sixth Amendment protections, specifically the right to counsel, when an individual faces incarceration. While the majority relies on Terry and even In re Oliver, 333 U.S. 257 (1948), those cases predated the Supreme Court's landmark decision in Gideon v. Wainwright, which held that a defendant's constitutional right to counsel is a prerequisite to ensuring a "fair system of justice." 372 U.S. 335, 344 (1963). An attorney who is knowledgeable as to the law and can speak on behalf of his client is "fundamental and essential" to a fair proceeding. Id. at 341.

The United States Supreme Court case of Bloom v. Illinois, 391 U.S. 194 (1968), recognized the importance of constitutional protections in determining that the Sixth Amendment right to a jury trial applies to criminal contempt proceedings where punishment exceeds six months' incarceration. The Supreme Court emphasized that, because this particular crime frequently involves a rejection of judicial authority, the ability to summarily imprison for contempt is particularly "liable to abuse":

> Given that criminal contempt is a crime in every fundamental respect, the question is whether it is a crime to which the jury trial provisions

of the Constitution apply.  We hold that it is, primarily because in terms of those considerations which make the right to jury trial fundamental in criminal cases, there is no substantial difference between serious contempts and other serious crimes.  Indeed, in contempt cases an even more compelling argument can be made for providing a right to jury trial as a protection against the arbitrary exercise of official power.  Contemptuous conduct, though a public wrong, often strikes at the most vulnerable and human qualities of a judge's temperament.  Even when the contempt is not a direct insult to the court or the judge, it frequently represents a rejection of judicial authority, or an interference with the judicial process or with the duties of officers of the court.

The court has long recognized the potential for abuse in exercising the summary power to imprison for contempt—it is an "arbitrary" power which is "liable to abuse."  Ex parte Terry, 128 U.S. 289, 313 (1888).

Bloom, 391 U.S. at 201-02 (emphasis added).

More importantly, Florida's constitutional right to counsel under article I, section 16, of the Florida Constitution has been construed even more broadly than its federal counterpart.  See State v. Kelly, 999 So. 2d 1029, 1041 (Fla. 2008).  This Court has pronounced that incarceration, as a form of punishment, is such a "penalty different in kind and severity from other penalties" that it triggers the constitutional right to counsel.  Id. at 1052.  We have further emphasized that the right to counsel applies even when there is a possibility of incarceration for a misdemeanor—as opposed to the Sixth Amendment, which requires counsel only where the defendant is actually imprisoned for the charged offense:

Under established Florida law, the right of indigents to appointed counsel in misdemeanor cases differs from its federal counterpart.  In Argersinger v. Hamlin, 407 U.S. 25, 35-40 (1972), the United States

Supreme Court appeared to hold that prospective imprisonment for a misdemeanor offense guarantees indigents a right to appointed counsel, but the Court clarified in <u>Scott v. Illinois</u>, 440 U.S. 367, 373-74 (1979), that under the Sixth Amendment this right is limited to cases in which the defendant is <u>actually imprisoned</u> for the charged offense.  Florida, however, has provided a different standard through its Constitution, Rules of Criminal Procedure, and the Florida Statutes.  <u>See</u> art. I, §§ 2, 16, Fla. Const.; Fla. R. Crim. P. 3.111, 3.160; § 27.51, Fla. Stat. (2003).  In Florida, indigent criminal defendants have a right to appointed counsel "<u>for offenses punishable by imprisonment</u>."  Fla. R. Crim. P. 3.111(b)(1) (1992) (emphasis supplied).

<u>Id.</u> at 1040-41.

In <u>Parisi v. Broward County</u>, 769 So. 2d 359, 364 (Fla. 2000), this Court specifically recognized that Florida's constitutional rights—including the right to counsel—apply to direct criminal contempt proceedings.  While providing an overview as to a court's various contempt powers, this Court held that prior to the imposition of criminal contempt sanctions, a contemnor must be afforded certain due process, including "the right of criminal defendants to be represented by counsel, the right to have the State prove the offense beyond a reasonable doubt, and the right not to incriminate oneself."  This Court then stated that "[i]n addition to these constitutional rights, our rules of criminal procedure provide specific procedures for <u>both</u> direct and indirect criminal contempt."  <u>Id.</u> at 365 (emphasis added).

Besides honoring the constitutional rights of the individual, both the Florida Statutes and the Florida Rules of Criminal Procedure likewise recognize the

importance of counsel when incarceration is at issue. Section 27.51, Florida Statutes, provides that a public defender "shall" represent an indigent, and specifically provides that this provision applies to those who are charged with criminal contempt, unless the court files an order of no imprisonment. § 27.51(1)(a)-(b), Fla. Stat. In fact, the addition of "criminal contempt" to the crimes for which a court "shall" appoint counsel occurred in 1995 and the Legislature made no distinction between "indirect" and "direct" criminal contempt. See ch. 95-195, §15, Laws of Fla.

This statute reflects the Legislature's clear intent that counsel should be appointed where a defendant is facing a possible punishment of incarceration, particularly as the statute does not distinguish between direct and indirect criminal contempt for purposes of appointing counsel. Likewise, Florida Rule of Criminal Procedure 3.111(b)(1) broadly provides: "Counsel <u>shall</u> be provided to indigent persons in <u>all prosecutions for offenses punishable by incarceration</u> including appeals from the conviction thereof." Fla. R. Crim. P. 3.111(b)(1) (emphasis added).

I acknowledge that Florida Rule of Criminal Procedure 3.830, governing direct criminal contempt, unlike rule 3.840 that governs indirect criminal contempt, does not address entitlement to counsel. However, in my view, while rule 3.830 states that direct criminal contempt "may" be punished "summarily," the term

"summarily" does not mean without a modicum of due process rights. Moreover, nothing in rule 3.830 is inconsistent with rule 3.111(b)(1), which mandates counsel in all prosecutions punishable by incarceration.

Thus, the United States Constitution, our Florida Constitution, the Florida Statutes, and the Florida Rules of Criminal Procedure uniformly provide that an individual should be entitled to counsel in direct criminal contempt proceedings before incarceration is imposed. But even if the right to counsel were not grounded in any of these authorities, the balance of public policy and practical concerns should still demand appointment of counsel before incarceration is imposed as punishment for direct criminal contempt.

## II. The Public Policy Concerns of Direct Criminal Contempt

I strongly disagree with the State's premise that "providing the contemnor with a lawyer and other procedural safeguards . . . [would] really allow the contemnor to disrupt the court system further" and would undermine a court's ability to ensure the administration of justice. This premise does not withstand scrutiny. In fact, considering the practical requirement of such a rule, especially in the context of this case, makes clear that exactly the opposite is true.

First, although the State claims that the courtroom could become a "circus" if the misconduct is not stopped, this is simply a red herring. In reality, the requirement of counsel and the timing of the actual contempt hearing have no

- 37 -

impact on a judge's ability to immediately stop the misconduct and take the contemnor into custody. See, e.g., Al-Hakim v. State, 53 So. 3d 1171, 1172-73 (Fla. 2d DCA 2011) (after a member of the public disturbed the courtroom in response to the public defender's rejection of adopting a pro se motion, the contemnor was handcuffed and taken into custody and the contempt proceeding was set for later that day); Forbes v. State, 933 So. 2d 706, 708 (Fla. 4th DCA 2006) (after a 19-year-old prospective juror failed to disclose during voir dire that he had a pending criminal charge, the court set his contempt proceeding for a time after jury selection concluded); Hayes, 592 So. 2d at 327-28 (after a criminal defendant left during a break to bring a witness back to court but arrived to court late, the trial judge required the defendant to appear at a hearing three weeks later and show cause why he should not be held in contempt of court). In most cases, including this one, the actual contempt hearing does not occur immediately.

For example, here, Plank was in the courtroom, sleeping, until a break was taken during the voir dire. The trial judge did not address the contemptuous conduct—presumably being drunk and sleeping during voir dire—in front of the other prospective jurors. Only after a break was taken did the trial judge send Plank for a breathalyzer test, after which point the judge conducted the contempt hearing and ultimately determined to incarcerate Plank for thirty days.

I suspect Plank would have remained incarcerated for thirty days if the Public Defender's Office had not filed a motion on his behalf, which prompted the trial judge to mitigate the sentence to time served. At that point, when he finally received the assistance of an attorney, Plank, who was already behind on his mortgage payments, had lost seventeen days' worth of income. It is difficult to see how justice was furthered by the events that transpired in this case.

Second, the practical effect of requiring the defendant to have counsel in direct criminal contempt proceedings will not impact a significant number of cases. Requiring the opportunity to retain or appoint counsel for direct criminal contempt cases is moot if the contemnor already has counsel. For instance, a contemnor who commits misconduct in the courtroom during his or her own trial is likely already represented by counsel, so the court does not need to take additional actions to appoint counsel for the direct criminal contempt proceedings. Ironically, then, the defendant who is already charged with a crime and is represented by counsel receives greater protections if charged with direct criminal contempt. In contrast, a layperson called to jury duty, as here, or a witness to a proceeding who may lack knowledge of courtroom procedures or become frustrated with the adversarial nature of court proceedings does not enjoy the same protections.

Third, an immediate sentence of incarceration is not essential in order to ensure that courtroom business can be conducted efficiently and promptly without

further disruption, particularly because the court, through its bailiffs, can immediately take the contemnor into custody and remove him or her from the courtroom. As former Chief Justice Burger observed: "The contempt power . . . is of limited utility in dealing with an incorrigible, a cunning psychopath, or an accused bent on frustrating the particular trial or undermining the processes of justice. For such as these, summary removal from the courtroom is the really effective remedy." Mayberry v. Pennsylvania, 400 U.S. 455, 467 (1971) (Burger, C.J., concurring). Other sanctions short of incarceration may be more effective or appropriate, especially when dealing with lay people. Indeed, not all direct criminal contempt proceedings even mandate a term of incarceration. See, e.g., Gruss v. State, 869 So. 2d 770, 771 (Fla. 4th DCA 2004) (after a prospective juror was not excused from jury service despite business commitments and then attempted to avoid jury duty by abruptly asserting she could not be fair and unbiased, the trial judge held the juror in direct contempt of court and ordered her to write a letter of apology and read it the next day in open court).

Fourth, the appointment of counsel could help ensure that direct criminal contempt proceedings remain limited to the situation where the misconduct occurred in open court and truly affects the court's authority, thus justifying the use of direct criminal contempt. A person adjudicated guilty of direct criminal contempt has the opportunity to "present evidence of excusing or mitigating

circumstances." See Fla. R. Crim. P. 3.830. Yet, most contemnors, without knowledge of the law, do not know what to say, much less understand what type of evidence constitutes excusing or mitigating circumstances.

In fact, that is what occurred in this very case. When the trial judge asked Plank for mitigation, he replied that he did not know what to say. In addition, at the time of the contempt hearing, he was still intoxicated, thus further limiting his ability to present mitigation. With the benefit of counsel, Plank could have presented relevant mitigation and suggested a less severe sanction than incarceration. Further, counsel could have objected to the trial judge using uncharged crimes as a part of the decision in sentencing Plank to thirty days of incarceration. When Plank obtained an attorney weeks later, the judge mitigated the sentence to time served—but the defendant had already been incarcerated for seventeen days.

In sum, the policy concerns behind reasons for appointing counsel weigh heavily in favor of extending this right to all individuals charged with direct criminal contempt who are facing incarceration. Requiring the appointment of counsel would not diminish the power of the trial judge to immediately remove an individual from the courtroom to prevent any further disruption, and instead would enhance the dignity of the court and increase the chances that justice will be served.

### III. Conclusion

As this Court has long held, in matters involving a court's authority to address contempt, "a balance must be struck between the recognition that courts are vested with contempt powers to vindicate their authority and the necessity of preventing abuse of these broad contempt powers." Parisi, 769 So. 2d at 363.  I would conclude that prior to imposing incarceration as punishment for direct criminal contempt, the court should allow the contemnor to either obtain counsel or have counsel appointed.  However, in this case, the trial court erred in treating the proceeding as one of direct criminal contempt and therefore I concur with the majority's decision to vacate the conviction.

QUINCE and PERRY, JJ., concur.

Application for Review of the Decision of the District Court of Appeal - Certified Direct Conflict of Decisions

     First District - Case No. 1D13-4458

     (Leon County)

Nancy Ann Daniels, Public Defender, and Colleen Dierdre Mullen, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

     for Petitioner

Pamela Jo Bondi, Attorney General, Trisha Meggs Pate, Bureau Chief, and Virginia Chester Harris, Assistant Attorney General, Tallahassee, Florida,

     for Respondent